IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN TITLE COMPANY, LLC.,<br><br>                    Plaintiff,<br>v.<br><br>NORTHWEST TITLE INSURANCE AGENCY, LLC, MICHAEL SMITH, JEFF WILLIAMS, and KRISTI CARRELL,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PRELIMINARY INJUNCTION**<br><br>Case No. 2:15-cv-00229<br><br>District Judge David Nuffer |

Plaintiffs First American Title Insurance Company and First American Title Company, LLC (First American) sought a preliminary injunction against Northwest Title Insurance Agency, LLC (Northwest) and Michael Smith, Jeff Williams, and Kristi Carrell (Individual Defendants).[1] First American based its motion against Northwest and the Individual Defendants on numerous grounds. The defendants opposed the motion[2] and Northwest replied.[3] A hearing was held September 19, 2016.[4] Because First American failed to show irreparable harm, the motion is DENIED.

---

[1] Plaintiff's Motion for Preliminary Injunction and Memorandum in Support (Motion), docket no. 101, filed January 28, 2016.

[2] Memorandum in Opposition to Motion for Preliminary Injunction (Opposition), docket no. 137-1, filed March 11, 2016.

[3] Reply Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, docket no. 150, filed March 25, 2016.

[4] Docket no. 282.

**Table of Contents**

Background ............................................................................................................................ 2
Discussion ............................................................................................................................ 4
    1.     First American did not show ongoing, irreparable injury from the breached
         contracts. ................................................................................................................ 5
         a.     First American did not show ongoing, irreparable injury flowing from the
               Equity contracts. ........................................................................................... 5
         b.     First American did not show ongoing irreparable harm flowing from the
               point-and-click agreements. ......................................................................... 7
    2.     First American did not show that the defendants' tortious interference is causing
         ongoing, irreparable injury. .................................................................................. 8
    3.     First American did not show ongoing, irreparable injury flowing from the
         defendants' misappropriation of trade secrets. ..................................................... 9
    4.     First American did not show ongoing, irreparable injury flowing from the
         defendants' unfair competition. .......................................................................... 12
Conclusion ........................................................................................................................ 13

## BACKGROUND[5]

The Individual Defendants worked for Equity Title Insurance Agency, Inc. (Equity). At various points all defendants signed contracts with Equity containing non-compete provisions.[6] Michael Smith's and Jeff Williams's contracts also had non-solicitation provisions.[7] Each agreement bound the Individual Defendants for up to one year.

---

[5] This factual summary and other facts recited in this order are made in the context of assessment of likelihood of success and are based only on the materials submitted on this motion. The order does not reflect undisputed facts on summary judgment motions still under consideration and certainly does not reflect or influence findings to be made on contested issues by a jury at trial. The factual statements in this summary or made by the court at the hearing will not be discussed at the jury trial.

[6] Michael Smith Employment Agreement ¶ 7, attached as exhibit 5 to the Motion, docket no. 103-6, filed January 29, 2016; Jeff Williams Employment Agreement ¶ 7, attached as exhibit 6 to the Motion, docket no. 103-7, filed January 29, 2016; Kristi Carrell Employment Agreement ¶ 7, attached as exhibit 7 to the Motion, docket no. 103-8, filed January 29, 2016. Relevant provisions discussed *infra* § 1(a).

[7] Michael Smith Employment Agreement ¶ 8; Jeff Williams Employment Agreement ¶ 8. Relevant provisions are discussed *infra* § 1(a).

Between September 2003 and February 2009, First American purchased incremental portions of Equity.[8] By February 2009, First American became Equity's sole owner.[9] Equity continued to operate under its own name as a division of First American until the two entities merged in 2012.[10] From that point forward, the name Equity was no longer used.[11]

While working at First American, the Individual Defendants reviewed and electronically acknowledged many company documents, including the following: First American Confidential Information and Inventions Agreement, First American Code of Ethics and Conduct, and The First American Handbook (collectively, "point-and-click agreements").[12]

Eventually the Individual Defendants and others grew dissatisfied with First American.[13] On January 26, 2015, Mike Smith, Jeff Williams, and others organized and registered Northwest Title.[14] On March 9, 2015, Mike Smith resigned from First American and began working for Northwest Title.[15] On March 10, 2015, Jeff Williams and Kristi Carrell also resigned from First American and began working at Northwest Title.[16] By the end of March 2015, 25 other First

---

[8] Declaration of Mark Webber ¶¶ 6–12, attached as exhibit 2 to the Motion, docket no. 103-4, filed January 29, 2016.

[9] Id. ¶ 12.

[10] Id. ¶ 13.

[11] Id.

[12] Attached as exhibit G to the Declaration of Elaine Basler, attached as exhibit 10 to the Motion, docket no. 103-11, filed January 29, 2016 (showing digital timestamps for each employees' electronic acknowledgment of the point-and-click agreements).

[13] Opposition at xxxviii–xliv.

[14] Court Exhibit 1 to the motion for preliminary injunction hearing (Timeline), docket no. 283, entered September 19, 2016. First American provided the court with the Timeline, and in the preliminary injunction hearing Northwest admitted to the events and the chronology as presented in the Timeline with the exception of specific departure dates for employees other than the Individual Defendants.

[15] Id.

[16] Id.

American employees left First American for Northwest.[17] When the Individual Defendants left

First American for Northwest, they, and others, allegedly took First American documents.[18]

On April 3, 2015, First American brought suit against the defendants.[19] And on January

28, 2016, First American moved the court to issue a preliminary injunction against the

defendants.[20] First American based its preliminary injunction against defendants on the

following allegations:[21]

1.   The Individual Defendants breached their employment contracts;[22]

2.   All defendants tortiously interfered with First American's employment
     contracts;[23]

3.   All defendants misappropriated trade secrets;[24] and

4.   All defendants unfairly competed with First American.[25]

## DISCUSSION

To obtain a preliminary injunction, the movant must show that "(1) it is substantially

likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3)

its threatened injury outweighs the injury the opposing party will suffer under the injunction; and

(4) the injunction would not be adverse to the public interest."[26] "Because a showing of probable

---

[17] Motion at 18–19.

[18] Appendix A, docket no. 103-1, filed January 29, 2016; discussed in greater detail *infra* § 3.

[19] Complaint, docket no. 2, filed April 3, 2015.

[20] Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support, docket no. 101, filed January 28, 2016.

[21] First American did not base the Motion on counts VI, XI, and XII of the Complaint. At the hearing, it also dropped count XIII as a basis for the preliminary injunction.

[22] Motion at 32–38.

[23] *Id.* at 41–43.

[24] *Id.* at 38–41.

[25] *Id.* at 41–43.

[26] *Belltronics USA, Inc. v. Midwest Inventory Distribution, LLC,* 562 F.3d 1067, 1070 (10th Cir. 2009).

irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."[27] To establish irreparable injury, First American must show "a significant risk that [it] *will* experience harm that cannot be compensated after the fact by monetary damages."[28] "[T]he irreparable-harm factor . . . weigh[s] against issuance of a preliminary injunction [if it] . . . *already occurred* [and] could be remedied through damages."[29]

1. **First American did not show ongoing, irreparable injury from the breached contracts.**

First American alleges that the Individual Defendants breached two sets of agreements: the paper agreements they signed with Equity to not compete and not solicit; and the point-and-click agreements each Individual Defendant acknowledged electronically while working for First American.

a. **First American did not show ongoing, irreparable injury flowing from the Equity contracts.**

While it appears First American is legally entitled to enforce the Individual Defendants' Equity contracts, those contracts cannot be grounds for injunctive relief. Even if, as First American argues,[30] the Individual Defendants' contracts are valid and the non-compete and non-solicitation provisions were properly triggered, the terms of those provisions have expired. Michael Smith's non-compete and non-solicitation agreements expired, at the latest, March 10,

---

[27] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).

[28] *Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, L.L.C.*, 636 F.Supp.2d 1237, 1248 (D. Utah 2009) (emphasis added).

[29] *CDI Energy Services v. West River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (emphasis added).

[30] Motion at 32–37.

2016.[31] And further, because he left voluntarily and was not terminated, it appears he had no

non-competition obligation after leaving First American,[32] though he did have a non-solicitation

obligation for one year.[33] Jeff Williams's non-compete and non-solicitation agreements and

Kristi Carrell's non-compete agreement expired, at the latest, March 11, 2016.[34]

      First American is not entitled to prospective enforcement of the non-compete and non-

solicitation agreements. Prospective relief may be available if there is an applicable provision

tolling the non-compete or non-solicitation agreements;[35] or if there are extraordinary

circumstances such as repeated stays obtained by the wrong-doer during the pendency of an

appeal.[36] Substantial other reasons, such as mootness[37] and lack of an actual case or

controversy,[38] also limit First American's right to a preliminary injunction.

      There is no tolling provision in the contracts. There are no extraordinary circumstances.

And, most importantly, any First American customer interested in moving business to Northwest

based on the personnel migration has likely already done so. "Damages can now be determined

---

[31] Timeline.

[32] Michael Smith Employment Agreement ¶ 7 ("During his employment with Equity, and for a period of one (1) year thereafter, *if terminated for "Cause"* (as defined in Section 10 below), Smith shall not, directly, or indirectly, either as an employee, employer, consultant, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Equity, covering an area in all directions 100 miles from any of the offices of Equity.") (emphasis added).

[33] *Id.* ¶ 8 ("*During his employment with Equity, and for a period of one (1) year thereafter*, Smith, on behalf of himself or any other person or entity, shall not hire, attempt to hire, recommend for hire, or employ, directly or indirectly, any employee of Equity. During this one-year period of time, Smith shall not encourage or induce any employee of Equity to resign from Equity or assist any other employer in recruiting or hiring any employee away from Equity.") (emphasis added).

[34] Timeline.

[35] *Proudfoot Consulting Co. v. Gordon,* 576 F.3d 1223, 1229 (11th Cir. 2009).

[36] *Kodekey Elecs., Inc.v. Mechanex Corp.*, 500 F.2d 110, 112 (10th Cir. 1974).

[37] *Kasco Services Corp. v. Benson*, 831 P.2d 86, 92 (Utah 1992).

[38] *Henco, Inc. v. Brown*, 904 F.2d 11, 13 (7th Cir. 1990).

with reasonable certainty at this point in the litigation."[39] Any future customer or employee

movement will, if at all, likely be based on legitimate marketplace advantage. Though there may

be claims for damages, an injunction at this point

> would, in effect, constitute an act of retribution of vengeance that would simply penalize [the wrongdoer] for his duplicity, a result which hardly comports with the general policy of limiting employee restrictions which have no purpose but to deprive the employee of his livelihood without any reasonable possibility of protecting the employer . . . . Cui bono?[40]

### b.    First American did not show ongoing irreparable harm flowing from the point-and-click agreements.

If the point-and-click agreements are enforceable and the individual defendants breached

them, First American has not shown any ongoing, irreparable harm—the harm, if any, has

"already occurred [and] could be remedied through damages."[41]

The First American Confidential Information and Inventions Agreement provides that the

employee "must safeguard and maintain the confidentiality, integrity and availability of all

confidential information at all times."[42] And further, that the employee "will not, during or at

any time after the cessation of [the employee's] Engagement with the Company for whatever

reason, access, use, reproduce, or disclose any confidential information."[43] Though the material

each defendant allegedly took will be given greater attention below,[44] in the context of the CIIA,

First American failed to show how the Individual Defendants' violations are *occurring* or *will

continue* to occur. First American failed to show how it needed a remedy in addition to damages.

---

[39] *Kasco Services Corp.*, 831 P.2d at 92.

[40] *USAchem, Inc. v. Goldstein,* 512 F.2d 163, 169 (2d Cir. 1975).

[41] *CDI Energy Services,* 567 F.3d at 403.

[42] Confidential Information and Inventions Agreement (October 2011) (CIIA) ¶ 3, attached as exhibit 11 to the Motion, docket no. 103-12, filed January 29, 2016.

[43] *Id.*

[44] *Infra* § 3.

The Employee Handbook and the Code of Ethics have several overlapping, relevant provisions. They prohibit conflicts of interest between employees and First American[45] and they prohibit disclosing confidential information.[46] First American may be able to show that the Individual Defendants violated these provisions. And it may be able to show damages resulting from those violations. But it did not show how damages will continue to flow without a preliminary injunction. Even if, for example, the Individual Defendants worked or prepared to work for Northwest while employed for First American, that ended at their resignations. Contact with First American customers and use of First American forms occurred in the year before the motion for preliminary injunction was filed. Damages would effectively remedy that injury.

2.    **First American did not show that the defendants' tortious interference is causing ongoing, irreparable injury.**

First American alleges that the defendants tortiously interfered not only with the contracts between it and the Individual Defendants, but also with contracts between it and all the employees who left First American:

> Almost all of the employees who left First American for Northwest Title were bound by the provisions in the CIIA, Code of Ethics, and Employee Handbook…. [The defendants] nonetheless engaged many of these employees in competitive activities before their departures and allowed them to take confidential information from First American which they used at Northwest Title. That is tortious interference.[47]

Even if those past events occurred, First American has not shown how those events continue to be a problem. By First American's admission, the last employees to leave First

---

[45] Code of Ethics and Conduct (August 21, 2012) ¶ A, attached as exhibit 12 to the Motion, docket no. 103-13, filed January 29, 2016; Employee Handbook (January 2012) at 4-26, attached as exhibit 13 to the Motion, docket no. 103-14, filed January 29, 2016.

[46] Code of Ethics and Conduct ¶ E; Employee Handbook at 5-7.

[47] Motion at 42–43.

American for Northwest left March 23, 2015.[48] At this point, 18 months after the fact, a preliminary injunction would serve no purpose other than punishment, which is more appropriately inflicted by an award of damages.

> **3.    First American did not show ongoing, irreparable injury flowing from the defendants' misappropriation of trade secrets.**

First American alleges that the Individual Defendants took "heaps of information" before leaving First American.[49] Exhibit A to its motion lists the 233 documents the Individual Defendants allegedly misappropriated. First American divides them into six categories, focusing on the key documents in each category. Careful examination of these documents at the hearing revealed that many are not likely to be shown to be trade secrets. Those which might be trade secrets include:

a.  Financial Information:
    i.  Executive Dashboard[50]—"A comprehensive report identifying the financial goals and results for every First American office in Utah, including detailed data on sales and revenue."[51]
        - First American did not show that the defendants used, are currently using, or intend to use the Executive Dashboard.
    ii. Profit and loss data for First American's Sugar House Office[52]—"Breaks down revenue such as insurance premiums and escrow and closing fees as well as expenses like salaries, commissions, bonuses, and other fixed and variable costs."[53]
        - First American did not show that the defendants used, are currently using, or intend to use this data.

---

[48] Timeline.

[49] Motion at 38.

[50] 3/2/15 K. Carrell e-mail to kcarrell2@msn.com, attaching Dashboard Daily Report, attached as exhibit 61 to the Motion, docket no. 102-31, filed January 28, 2016.

[51] Motion at 24.

[52] 3/10/15 K. Carrell email to kcarrell2@msn.com attaching Profit and Loss Statement for First American's Sugar House Office, attached as exhibit 62 to the Motion, docket no. 102-32, filed January 28, 2016. Exhibit 62

[53] Motion at 24.

  iii. 4/18/14 Draft of Internal Audit Report of First American's Sugar House office[54]—"Evaluation of branch's internal controls and testing of a selected sample of the branch's escrow processes."[55]

   &bull; First American did not show that the defendants used, are currently using, or intend to use this report.

  iv. Action Plan to Internal Audit Report[56]

   &bull; First American did not show that the defendants used, are currently using, or intend to use this action plan.

 b. Payroll Information

  Commission reports for all escrow officers and assistants in the Sugar House office.[57]

  &bull; First American attaches deposition testimony showing that Doug Smith sought input for determining employee salary from three Northwest managers,[58] including Kristi Carrell, who allegedly took most of the payroll information.[59] First American, however, never provides any evidence indicating that the defendants based its offers on knowledge gleaned from these specific documents. Nor did First American show that that the defendants are currently using, or intend to use this information for future offers.

 c. Customer Lists

  The lists included "customer names and business contact information; they contained other personal information such as the customers' cellular phone numbers, birthdays, names of spouses, and information about how and when the customer preferred to be contacted."[60]

---

[54] 4/18/14 draft of Internal Audit Report for First American's Sugar House Office, attached as exhibit 63 to the Motion, docket no. 102-33, filed January 28, 2016.

[55] Motion at 24.

[56] 5/1/14 draft of Internal Audit Report for First American's Sugar House Office, attached as exhibit 64 to the Motion, docket no. 102-34, filed January 28, 2016.

[57] 3/2/15 K. Carrell e-mail to kcarrel2@msn.com, forwarding 1/9/15 e-mail chain between K. Carrell and C. Dornbier, attached as exhibit 65 to the Motion, docket no. 102-35, filed January 28, 2016; 2/18/15 K. Carrell e-mail to kcarrell2@msn.com, forwarding E. Cole 2014 Report, attached as exhibit 66 to the Motion, docket no. 102-36, filed January 28, 2016; 2/20/15 K. Carrell e-mail to kcarrell2@msn.com forwarding C. Drew 2014 Report, attached as exhibit 67 to the Motion, docket no. 102-37, filed January 28, 2016; 2/20/15 K. Carrell e-mail to kcarrell2@msn.com, forwarding M. Brown 2014 Report, attached as 68 to the Motion, docket no. 102-38, filed January 28, 2016.

[58] Doug Smith Deposition Excerpts at 156:9–157:18, attached as exhibit 3 to the Motion, docket no. 103-5, filed January 29, 2016.

[59] Motion at 25.

[60] Motion at 27; lists found at the following exhibits: 10/10/14 K. Carrell e-mail to kcarrell2@msn.com attaching First American customer list, attached as exhibit 74 to the Motion, docket no. 102-42, filed January 28, 2016; 2/6/15 K. Carrell e-mail to kcarrell2@msn.com attaching First American customer lists, attached as exhibit 75 to the Motion, docket no. 102-43, filed January 28, 2016; 2/10/15 K. Carrell e-mail to kcarrell2@msn.com, attaching First American customer birthday list, attached as exhibit 76 to the Motion, docket no. 102-44, filed January 28, 2016; 3/14/15 Kcarrell2@msn.com e-mail to K. Carrell and M. Brown, attaching Homeowners Association Master List, attached as exhibit 77 to the Motion, docket no. 102-45, filed January 28, 2016; 3/10/15 e-mail from

- Though First American provides admissions[61] and deposition testimony[62] showing that the defendants "regularly solicit various customers and potential customers" of First American, First American fails to show any indication that the defendants solicit those customers using these lists. In fact, Carrell argues that "she has recreated the list [including email addresses and phone numbers] she currently uses from memory."[63]

After enumerating the material allegedly misappropriated and failing to affirmatively identify irreparable harm, First American attempts to bypass the irreparable harm analysis in two ways: 1) through a narrow reading of 10th Circuit case law; and 2) the presumption of irreparable harm that arises with trade secrets.

First, in *Star Fuel Marts, LLC v. Sam's East, Inc.*,[64] the Tenth Circuit noted that "[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown."[65] The Uniform Trade Secrets Act,[66] the basis of First American's misappropriation claims, provides for injunctive relief.[67] But this does not obviate First American's burden to show that the "defendants are *engaged in*, or *about to be engaged in*"[68] prohibited activities. Even if the documents listed above are trade secrets, First

---

kcarrell2@msn.com to kcarrell@nwtitleutah.com attaching First American customer list, attached as exhibit 78 to the Motion, docket no. 102-46, filed January 28, 2016.

[61] Answer at ¶ 108.

[62] Jeff Williams Deposition Excerpts at 40:12–41:6, attached as exhibit 3 to the Motion, Docket no. 103-5, filed January 29, 2016.

[63] Opposition at 34.

[64] 362 F.3d 639 (10th Cir. 2004).

[65] *Id.* at 651.

[66] Utah Code § 13-24.

[67] Utah Code § 13-24-3.

[68] *Star Fuel Marts*, 362 F.3d at 651 (emphasis added).

American can, at best, only show that they were at some point in the past "used" by the defendants.[69] There appears to be no evidence showing that the use is continuing or threatened.

Secondly, the Utah Supreme Court in *InnoSys, Inc. v. Mercer*[70] held that establishing a prima facie case of misappropriation of trade secrets creates "a presumption of irreparable harm."[71] Again, assuming the documents listed above are trade secrets, thus triggering the presumption, there remain practical issues: What can now be enjoined? And to what end? As stated above, there is no evidence that any of that material is currently being used. Thus, an injunction ordering defendants to cease using the appropriated material would be meaningless. And further, enjoining the parties to disgorge any material taken from First American would have little real effect: Any value the material had as trade secrets is lost in the now 18 months since the alleged misappropriation.

Under the UTSA there may be a case for damages, but it would be inappropriate to grant preliminary injunction.

### 4.    First American did not show ongoing, irreparable injury flowing from the defendants' unfair competition.

Closely intertwined with its tortious interference claims, First American further argues that Northwest engaged in predatory hiring: "Northwest Title raided First American with the intention of eliminating First American's presence in key areas of the Salt Lake City market . . . . These acts of predatory hiring are textbook examples of unfair competition."[72]

---

[69] *See* Melinda Conlin Deposition Excerpts at 49:12–50:8, attached as exhibit 3 to the Motion, docket no. 103-5, filed January 29, 2016.

[70] 364 P.3d 1013 (Utah 2015).

[71] *Id.* at 1018.

[72] Motion at 42.

What constitutes predatory hiring under Utah Code § 13-5a-102(4) has not been clarified by any Utah appellate court.[73] However, any alleged predatory hiring that could happen has likely already happened. As stated above, the last First American employee to leave First American for Northwest left March 23, 2015.[74] There is no reason to now issue an injunction against predatory hiring.

## CONCLUSION

Though it may have strong claims for damages, First American failed to show ongoing, irreparable harm. As First American summarized, the defendants' behavior "has diluted First American's goodwill, destroyed the value of its trade secrets, and diminished its market share."[75] Every alleged harm occurred in the past and is now more appropriately the basis for legal remedies.

This order does not recite other issues discussed at the hearing, on which preliminary rulings were made, because the lack of irreparable injury *at this time* renders a preliminary injunction unavailable.[76]

---

[73] Though Judge Faust in *Stevens-Henager Coll. v. Eagle Gate Coll.*, Minute Entry Decision, Case No. 040921860 (Utah Third Dist. Ct. September 10th, 2007) decided to give "predatory hiring" in the Utah statute a more expansive interpretation than federal case law gives "predatory hiring" in the Sherman Act, the more persuasive reading shows that the Utah Legislature contemplated the federal Sherman Act interpretation. Eagle Gate College's Supplemental Memorandum Regarding the Meaning of "Predatory Hiring Practices" at 4 *Stevens-Henager Coll., v. Eagle Gate Coll.*, Utah Third District Case No. 040921860, filed August 7, 2007, cites Representative Urquhart, the sponsor of the bill responding to a question about the meaning of "predatory hiring." Representative Urquhart states, "Yes, this is something courts have been struggling with this and 'predatory hiring' has become a term of art that the courts have fleshed out exactly what this means." Since there was yet no case law on the Utah statute, Representative Urquhart necessarily looked to federal law for the meaning of the "Predatory Practices." Thus, the better interpretation of "Predatory Hiring" for the Utah code is that it refers to those instances where the hiring party hires with the primary intention being to wound the opposing party. *See Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1259 (9th Cir. 1990). If the parties want to explore this legal issue further, they should, before October 3rd, jointly propose an order to certify the question to the Utah Supreme Court.

[74] Timeline.

[75] Motion at 45 (emphasis added).

[76] *Dominion Video Satellite*, 356 F.3d at 1260.

**ORDER**

The motion for preliminary injunction[77] is DENIED.

Dated September 27, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[77] Plaintiff's Motion for Preliminary Injunction and Memorandum in Support, docket no. 101, filed January 28, 2016.