IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN TITLE COMPANY, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>NORTHWEST TITLE INSURANCE AGENCY, LLC, MICHAEL SMITH, JEFF WILLIAMS, and KRISTI CARRELL,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART FIRST AMERICAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:15-cv-00229-DN<br><br>District Judge David Nuffer |

## BACKGROUND

Plaintiffs First American Title Insurance Company and First American Title Company, LLC (collectively "First American") brought suit against Northwest Title Insurance Agency, LLC (Northwest) and Michael Smith, Jeff Williams, and Kristi Carrell (collectively "Individual Defendants").[1] The first three causes of action are only against the Individual Defendants: Count I, Michael Smith breach of contract; Count II, Jeff Williams breach of contract; Count III, Kristi Carrell breach of contract.

In this motion,[2] First American seeks partial summary judgment on three narrow issues related only to those first three causes of action: (1) "that all rights to enforce the Individual Defendants' employment agreements transferred to First American by operation of law as part of

---

[1] Complaint, docket no. 2, filed April 3, 2015.

[2] Plaintiffs' Motion for Partial Summary Judgment and Memorandum in Support (Motion), docket no. 217, filed June 9, 2016.

the merger" between Equity Title and First American;[3] (2) "that the Individual Defendants violated the non-competition provisions in their contracts";[4] and (3) that "Smith and Williams violated non-solicitation provisions in their contracts."[5] Defendants opposed this motion.[6] First American replied to their Opposition.[7]

This order grants the motion except that it finds that Smith did not violate a non-competition obligation.

**Contents**

Background .................................................................................................................................... 1
Undisputed Material Facts ............................................................................................................. 3
Standard of Review ...................................................................................................................... 12
Discussion .................................................................................................................................... 13
    The Individual Defendants' employment agreements with Equity transferred to First
        American by operation of law as part of the merger. ........................................... 14
        (1)    The Individual Defendants' employment contracts remained in force after
            the stock purchase. ................................................................................... 15
        (2)    The Individual Defendants' employment contracts remained in force after
            the merger. ............................................................................................... 23
    Smith and Williams breached the non-solicitation provisions of their employment
        agreements; and Williams and Carrell breached the non-compete provisions of
        their employment agreements. ............................................................................. 25
        (1)    Smith and Williams violated the non-solicitation provisions of their
            employment agreements. ......................................................................... 25
        (2)    Williams and Carrell breached the non-compete provisions of their
            employment agreements; Smith did not. ................................................. 26
Conclusion ................................................................................................................................... 28
Order ........................................................................................................................................... 29

---

[3] *Id.* at 1.

[4] *Id.*

[5] *Id.*

[6] Opposition to Plaintiffs' Motion for Partial Summary Judgment (Opposition), docket no. 235, filed July 11, 2016.

[7] Reply Memorandum in Further Support of First American's Motion for Partial Summary Judgment (Reply), docket no. 293, filed October 3, 2016.

## UNDISPUTED MATERIAL FACTS[8]

1.      Michael Smith signed an Employment Agreement (Smith Agreement) with

Equity Title Insurance Agency, Inc. (Equity) on August 15, 2004.[9]

2.       Smith is an attorney.[10]

3.       Smith negotiated the terms of the Smith Agreement, read it before signing it, and

agreed to its terms.[11]

4.      Section 7 of the Smith Agreement is titled "Noncompetition."[12]

5.      Section 7 of the Smith Agreement provides:

> During his employment with Equity, and for a period of one (1) year thereafter, if
> terminated for "Cause" (as defined in Section 10 below), Smith shall not, directly,
> or indirectly, either as an employee, employer, consultant, director, or in any other
> individual or representative capacity, engage or participate in any business that is
> in competition in any manner whatsoever with the business of Equity, covering an
> area in all directions 100 miles from any of the offices of Equity. If Smith is
> terminated without Cause, the period for which he shall not compete with Equity
> as described above shall be reduced to six (6) months from the date of his
> termination. Notwithstanding the foregoing, nothing herein shall restrict Smith's
> right to practice law subsequent to termination of his employment with Equity;
> provided, however, that Smith shall not be employed by any person or entity
> engaged in the title insurance business.[13]

6.      Section 8 of the Smith Agreement is titled "Non-solicitation."[14]

7.      Section 8 of the Smith Agreement provides:

---

[8] This summary of the undisputed material facts is derived from the parties' memoranda. Edits have been made to
remove disputed material. Those edits are not indicated in the summary. The defendants include many factual and
legal glosses in the sections of the Opposition labeled "Defendants' Response to Plaintiffs' Statement of Elements
and Undisputed Material Facts" and "Defendants' Additional Material Undisputed Facts." Opposition at vi–xc. Per
Docket Text Order granting in part and denying in part 242 Motion to Strike, docket no. 286, entered September 27,
2016, "[a]ll unnecessary factual and legal glosses in [the Opposition] will be disregarded."

[9] Motion at 2; Opposition at vii.

[10] Motion at 2; Opposition at vii.

[11] Motion at 2; Opposition at vii.

[12] Motion at 2; Opposition at vii.

[13] Motion at 2–3; Opposition at vii–viii.

[14] Motion at 3; Opposition at viii.

During his employment with Equity, and for a period of one (1) year thereafter, Smith, on behalf of himself or any other person or entity, shall not hire, attempt to hire, recommend for hire, or employ, directly or indirectly, any employee of Equity. During this one-year period of time, Smith shall not encourage or induce any employee of Equity to resign from Equity or assist any other employer in recruiting or hiring any employee away from Equity.

8.      Under Section 12(b) of the Smith Agreement,  Smith agreed that "[t]he terms, conditions, and obligations of this Agreement shall inure to the benefit of, and be binding upon the parties hereto and the respective heirs, executors, administrators, successors and assigns thereof."[15]

9.      Jeff Williams signed an Employment Agreement (Williams Agreement) with Equity on May 16, 2006.[16]

10.      Williams read the Williams Agreement before signing it and agreed to its terms.[17]

11.      Section 7 of the Williams Agreement is titled "Noncompetition."[18]

12.      Section 7 of the Williams Agreement provides:

During his employment with Equity, and for a period of one (1) year thereafter, if terminated for cause, Williams shall not, directly, or indirectly, either as an employee, employer, consultant, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Equity, covering an area in all directions 100 miles from any of the offices of Equity. If Williams is terminated without cause, this non-competition provision shall not apply after such termination.[19]

13.      Section 8 of the Williams Agreement is titled "Non-solicitation."[20]

---

[15] Motion at 3; Opposition at ix.

[16] Motion at 3; Opposition at ix.

[17] Motion at 3: Opposition at ix.

[18] Motion at 3; Opposition at ix.

[19] Motion at 3; Opposition at ix–x.

[20] Motion at 4; Opposition at x.

14.    Section 8 of the Williams Agreement provides:

During his employment with Equity, and for a period of one (1) year thereafter, Williams, on behalf of himself or any other person or entity, shall not hire, attempt to hire, recommend for hire, or employ, directly or indirectly, any employee of Equity. During this one-year period of time, Williams shall not encourage or induce any employee of Equity to resign from Equity or assist any other employer in recruiting or hiring any employee away from Equity. If Williams is terminated without cause, this non-solicitation provision shall not apply after such termination.[21]

15.    Section 12 of the Williams Agreement provides:

Williams may terminate his employment with Equity at any time upon 30 days' prior written notice to Equity. Upon such termination, the one-year period of non-competition and non-solicitation described in Section 7 and Section 8 above shall apply.[22]

16.    Under Section 13(b) of the Williams Agreement,  Williams agreed that "[t]he terms, conditions, and obligations of this Agreement shall inure to the benefit of, and be binding upon the parties hereto and the respective heirs, executors, administrators, successors and assigns thereof."[23]

17.    Kristi Carrell signed a letter agreement with Equity (Carrell Agreement) regarding "Terms of Employment" on August 1, 2003.[24]

18.    Carrell read the Carrell Agreement before signing it and did not inform anyone that she did not agree to its terms.[25]

19.    Section 7 of the Carrell Agreement is titled "Non-Competition."[26]

20.    Section 7 of the Carrell Agreement provides:

---

[21] Motion at 4; Opposition at x–xi.

[22] Motion at 4; Opposition at xi.

[23] Motion at 4; Opposition at xi.

[24] Motion at 4; Opposition at xi.

[25] Motion at 4; Opposition at xi–xii.

[26] Motion at 4; Opposition at xii.

> During your employment with Equity Title and for a period of one year thereafter, you may not participate in any competing title insurance or escrow business within a 40-mile radius of any of Equity Title's offices.[27]

21.     In September 2003, First American acquired a 25% ownership interest in Equity.[28]

22.     First American acquired an additional 25% ownership interest in Equity in March 2005, making it a 50% owner.[29]

23.     In October 2008, First American purchased an additional 45% ownership interest in Equity through a Stock Purchase Agreement, making it the majority owner.[30]

24.     The Stock Purchase Agreement (SPA) is dated October 15, 2008. It was executed by First American Title Insurance Company as the Buyer, Orange Coast Title Company as the Seller, and Equity Title Insurance Agency, Inc., as the Company.[31]

25.     Under Section 2.9(b) and as reflected in Schedule 2.9(a) of the SPA, the Smith Agreement and the Williams Agreement were defined as "Material Contracts" that remained in "full force and effect."[32]

26.     Equity was not dissolved as a consequence of the SPA. It remained a separate legal entity and a division of First American until it merged with First American in 2012.[33]

---

[27] Motion at 4–5; Opposition at xii.

[28] Motion at 5; Opposition at xii.

[29] Motion at 5; Opposition at xii.

[30] Motion at 5; Opposition at xii.

[31] Motion at 5; Opposition at xiii.

[32] Motion at 5; Opposition at xv–xvii.

[33] Motion at 5; Opposition at xvii–xviii.

27.     First American acquired the remaining 5% ownership interest in Equity in February 2009, making it the sole owner.[34]

28.     The Individual Defendants worked for the Equity–First American entity until Equity and First American merged in 2012.[35]

29.     In 2012, First American Title Company, LLC, and Equity Title Insurance Agency, LLC, filed Articles of Merger and an Agreement and Plan of Merger with the Utah Department of Commerce.[36]

30.     The Preamble and Section 6 of the Agreement and Plan of Merger provide that Equity and First American were to "merge into a single entity." The effect was that Equity's "separate existence" ceased and it "merged with and into the Surviving Entity," which kept the name "First American Title Company, LLC."[37]

31.     Section 6 of the Agreement and Plan of Merger provides that "[a]ll the assets, rights, privileges, powers, immunities, purposes and property (real, personal, intellectual and mixed), of each of the Constituent Entities, and all debts due to either of them, shall be transferred to and vested in the Surviving Entity."[38]

32.     Each of the Individual Defendants continued their employment, in some capacity, with First American after the merger.[39]

---

[34] Motion at 5; Opposition at xviii.

[35] Motion at 5–6; Opposition at xviii–xxxv.

[36] Motion at 6; Opposition at xxxv.

[37] Motion at 6; Opposition at xxxv.

[38] Motion at 6; Opposition at xxxvi.

[39] Motion at 6; Opposition at xxxvi.

33.     On December 21, 2011—more than three years after the execution of the SPA—Smith sent an e-mail to Mark Webber asking "how to submit mileage reimbursement requests."[40]

34.     Regarding the monthly car allowance provided for in the Smith Agreement, Smith stated: "As I mentioned to you when we discussed this, I was under the impression the car allowance had been wrapped into the base salary a long time ago." So, he continued, "although it may appear as if I am asking for more, it really is no more than it once was." Webber responded: "Apparently your car allowance had not been rolled up because of your employment contract, but I have asked Kurt to seek approval to have it rolled up so that you can start getting mileage on top of it."[41]

35.     On two occasions in 2011, Smith sent e-mails regarding First American's right to enforce non-competition provisions in contracts that other employees had signed with Equity.[42]

36.     On June 17, 2011, Smith sent an e-mail to Mark Webber concerning an escrow officer. The escrow officer had signed an employment contract with Equity on December 5, 2005. The contract included a non-competition provision prohibiting the escrow officer from competing with Equity "anywhere within 40 miles of any office of Equity Title located in the State of Utah" for a "period of one (1) year following the termination" of his employment with Equity.[43]

37.     The escrow officer told Smith "about an offer he received from a title company that supposedly would pay him a lot more." Smith relayed:

> [The escrow officer] has done a nice job of developing some clients, but we have put a lot of great business in his lap. He has done a good job of maintaining that

---

[40] Motion at 7; Opposition at xxxvi–xxxvii.

[41] Motion at 7; Opposition at xxxvii–xxxviii.

[42] Motion at 7; Opposition at xxxviii–xxxix.

[43] Motion at 7; Opposition at xxxix.

business, but it is business we could have definitely passed on to other closers in the office . . . . My response was firm – I told him we were not in a position to offer him any more money, and that we would take him to the mat on the noncompete if he left for another title company.[44]

38.     In that same e-mail, Smith stated:

In response [the escrow officer] wondered out loud if I thought the non-compete restriction would hold up given, in his words "Equity is not the same company after First American took over." I responded that I absolutely believed the noncompete would be enforceable and that we would seek to enforce it if he leaves.

39.     In 2012, Williams entered into a bonus plan with First American.[45]

40.     In 2012, Carrell entered into a bonus plan with First American.[46]

41.     In 2014, Smith entered into a bonus plan with First American.[47]

42.     Smith's employment with First American ended on March 9, 2015.[48]

43.     Northwest Title opened to the public on March 9, 2015.[49]

44.     Smith is employed as a Principal of Northwest Title. He manages the day-to-day business of Northwest Title.[50]

45.     Williams voluntarily terminated his employment with First American on March 10, 2015.[51]

---

[44] Motion at 7–8; Opposition at xxxix–xl.

[45] Exhibit 11 Jeff Williams' Director, Escrow Staff Development Production Bonus Plan (the "Williams/FATCO Bonus Plan") [Filed Under Seal], docket no. 239-2, filed July 11, 2016.

[46] Exhibit 12 Kristi Carrell's Escrow Branch Manager Production Bonus Plan (the "Carrell/FATCO Bonus Plan") [Filed Under Seal], docket no. 239-3, Filed July 11, 2016.

[47] Exhibit 10 Mike Smith's Utah legal Counsel Production Bonus Plan (the "Smith/FATCO Bonus Plan" [Filed Under Seal], docket no. 239-1, filed July 11, 2016.

[48] Motion at 8; Opposition at xl–xli.

[49] Motion at 8; Opposition at xl–xlii.

[50] Motion at 8; Opposition at xliii.

[51] Motion at 8; Opposition at xliii.

46.     Williams is employed as Executive Vice President of Escrow Operations for Northwest Title. He oversees the day-today operations of escrow for Northwest Title.[52]

47.     Carrell resigned from First American on March 10, 2015.[53]

48.     Carrell is employed as a Vice President, an Escrow Officer, and Branch Manager of Northwest Title's Sugar House office.[54]

49.     Northwest Title's main corporate office also operates as its Sugar House branch office. It is located at 2150 South 1300 East, Suite 350, Salt Lake City, Utah 84106. Each of the Individual Defendants works out of Northwest Title's Corporate/Sugar House office.[55]

50.     First American's office in Sugar House is located at 2180 South 1300 East, Suite 130, Salt Lake City, Utah 84106.[56]

51.     Northwest Title's Corporate/Sugar House office is less than a mile from and actually just a few hundred feet from First American's Sugar House office. Smith testified that it is in the "building next door."[57]

52.     After resigning from First American, the Individual Defendants have been providing title insurance, escrow, and closing services on behalf of Northwest Title in direct competition with First American. And, prior to being employed by First American, they also provided the same or similar services to customers in direct competition with First American.[58]

---

[52] Motion at 8; Opposition at xliii–xliv.

[53] Motion at 8; Opposition at xliv.

[54] Motion at 8; Opposition at xliv.

[55] Motion at 9; Opposition at xliv–xlv.

[56] Motion at 9; Opposition at xlv.

[57] Motion at 9; Opposition at xlv.

[58] Motion at 9; Opposition at xlv–xlvi.

53.     The Individual Defendants and others regularly solicit various customers and potential customers of First American and of numerous title companies.[59]

54.     The Individual Defendants do not dispute that they have been competing with First American.[60]

55.     The Individual Defendants do not dispute that they have been competing since they resigned from First American.[61]

56.     Smith is an owner of Northwest Title.[62]

57.     Williams is an owner of Northwest Title.[63]

58.     Besides Smith and Williams, twenty-six other First American employees left First American to join Northwest at its inception.[64]

59.     Between March 10, 2015, and March 24, 2015, Northwest Title hired twenty-eight employees from First American.[65]

60.     Most of the Northwest Title employees who came from First American work in the same positions and locations as they did at First American.[66]

61.     In January 2015, Mike Smith introduced Jeff Williams and Casey Buhler, his long-time administrative assistant at First American, to Doug Smith.[67]

---

[59] Motion at 9; Opposition at xlvi–xlvii.

[60] Motion at 9; Opposition at xlviii

[61] Motion at 9; Opposition at xlviii.

[62] Motion at 10; Opposition at l.

[63] Motion at 10; Opposition at l.

[64] Motion at 10; Opposition at l–li.

[65] Motion at 10; Opposition at li–liii.

[66] Motion at 10; Opposition at liii.

[67] Motion at 10; Opposition at liii–lvi.

62.     Prior to that meeting, Smith had informed Williams and Buhler that he was considering forming a new title business. Smith told Doug Smith of Williams's and Buhler's interest in the new venture. Doug Smith later hired Williams and Buhler on behalf of Northwest Title.[68]

63.     Mike Smith also directed other First American employees to Doug Smith, who hired them on behalf of Northwest Title. Carrell got Doug Smith's information from Mike Smith. Carrell contacted Doug Smith, who she had never met or spoken to before, and he hired her.[69]

64.     After Smith announced his resignation, he was contacted by several people, including branch managers, who expressed an interest in going to the new company. Mike Smith referred some of them to Doug Smith.[70]

65.     Mike Smith announced his resignation from FATCO on March 9, 2015. Almost immediately, he was contacted by several people, including a number of branch managers, who expressed an interest in joining him at the new company. Mike Smith told him or her that he could make no offers on behalf of Northwest, but they could contact Doug Smith. Mike Smith testified that he "gave [some of] them Doug [Smith]'s contact information."[71]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[73] In

---

[68] Motion at 10; Opposition at lvi.

[69] Motion at 10–11; Opposition at lvi–lvii.

[70] Motion at 11; Opposition at lvii–lviii.

[71] Motion at 11; Opposition at lix.

[72] Fed. R. Civ. P. 56(a).

[73] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[74]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[75]

## DISCUSSION

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[76] Acknowledging "that genuine issues of fact may exist as to" the second and fourth elements,[77] First American's Motion only relates to the first and third elements. Specifically, First American seeks summary judgment on the following:

>    1.   "that all rights to enforce the Individual Defendants' employment agreements transferred to First American by operation of law as part of the merger";[78]
>    2.   "that the Individual Defendants violated the non-competition provisions in their contracts";[79] and
>    3.   "that Messrs. Smith and Williams violated the non-solicitation provisions in their contracts."[80]

Following that request, this memorandum decision and order will not address every element in the breach of contract claim. It does not address the full breadth of the question of whether the employment contracts were valid at formation or whether they were valid after the stock purchase and merger. And it will not address First American's performance or the question

---

[74] *Id.*

[75] *Id.* at 670-71.

[76] *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

[77] Plaintiffs' Motion to Strike Portions of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 5, docket no. 242, filed July 2, 2016.

[78] Motion at 1.

[79] *Id.*

[80] *Id.*

of damages. It is limited to the narrow parameters listed above. Thus, the following sections in Northwest's Opposition will not be considered:

1.       Argument Section II, titled: "FATCO Also Fails to Establish the Element of Damages."[81]

2.       Argument Section III, titled: "FATCO Also Does Not and Cannot Establish the Element of Its Performance . . ."[82]

3.       Argument Sub-section IV(A), titled: "FATCO Would not Be Entitled to Step into the Shoes of Equity and Thereby Expand or Extend the Individual Defendants' Obligations."

4.       Argument Sub-section IV(B), titled: "The Noncompetition and Nonsolicitation provisions in the Old Equity Contracts Are Unenforceable Because the Individual Defendants Were not Key Employees."[83]

5.       Argument Sub-section IV(D), titled: "Even if the Noncompetition and Nonsolicitation Provisions Were Somehow Enforceable . . ."[84]

**The Individual Defendants' employment agreements with Equity transferred to First American by operation of law as part of the merger.**

To establish that the Individual Defendants' employment agreements with Equity transferred to First American, First American must show that (1) the Individual Defendants' employment contracts remained in force after First American bought Equity through a stock purchase; and (2) that the Individual Defendants' employment contracts remained in force after Equity and First American merged.

---

[81] Opposition at 10–12.

[82] Opposition at 12–21.

[83] Opposition at 23–24.

[84] Opposition at 25.

**(1) The Individual Defendants' employment contracts remained in force after the stock purchase.**

"There are three basic approaches the participants can take to structure" the acquisition of one corporation by another:[85] statutory merger, asset purchase, or stock purchase.[86] Regarding asset purchases and stock purchases, the Court of Common Pleas of Pennsylvania in *Joyner Sports Med. Inst. Inc. v. Stejbach*[87] determined that the distinction between the two, is "a distinction without a difference."[88] Utah law disagrees:

> The distinctions between corporate stock and asset purchases are well recognized. Generally speaking, when all the assets of an ongoing business are purchased, the purchaser does not acquire the liabilities of the corporation as a stock purchaser would . . . . Additionally, the purchaser in an asset transaction takes legal title to the property, i.e., title to property transfers from one party to another . . . . Conversely, *in a stock purchase transaction the corporation's assets remain titled in the [original] corporation's name.*[89]

The Court of Chancery of Delaware also values the distinction:

> The relationship created by a purchase and sale of assets differs materially from that resulting from a stock purchase. In the former the buyer becomes the owner of the sellers' assets. In the latter it does not. In a sale of assets an identity of corporate interests is created. In a stock purchase the interests remain separate and distinct. The former has most, if not all of the incidents of a merger, and its result is the same as a merger. The incidents and result of the latter are substantially different. In a stock purchase the buyer, having no other business interests as here, becomes merely a holding company. In a sale of assets the buyer carries on its business as before, with additional assets.[90]

---

[85] Franklin A. Gevurtz, Corporation Law 675 (2d ed. 2010).

[86] *Id.*

[87] 45 Pa. D. & C.4th 242, 249 (Com. Pl. 1999).

[88] *Id.* at 249.

[89] *Sachs v. Lesser*, 163 P.3d 662, 674 n.18 (Utah Ct. App. 2007) (emphasis added). This case was reversed, on different grounds, in *Sachs v. Lesser*, 207 P.3d 1215 (Utah 2008). The Utah Supreme Court preserved the distinction between asset and stock purchases in the corporate setting. It held that "[d]espite the fact that stocks or shares in a corporation are generally considered personal property, there are occasions when their transfer is entirely secondary to the transfer of real property assets." *Id.* at 1219. Specifically, it determined that in the real estate transaction setting, "[a] sale of all of the stock of a corporation has been held to be a sale of its assets." *Id.*

[90] *Orzeck v. Englehart*, 41 Del.Ch. 223, 227–28 (Del. Ch. 1963) (citations omitted).

Because the corporation whose stock was acquired continues to exist, its interests persist, including its interests in ongoing contractual obligations. This is a basic tenet of corporation law: "Shareholders are promised equal participation, not in the ownership, but rather in the *use* of Company assets. This is *the* interest that stock ownership evidences";[91] "while the individual's interest in the partnership or corporation (which could be 100%) would be property of the estate, the assets of the partnership or corporation would not be."[92] This is due to the nature of corporations: "The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members."[93] Thus, any contractual obligation owed the target corporation remains the target corporation's after a stock purchase. Otherwise, if each stock purchase undermined the validity of contractual obligations owed the target corporation, general business continuity would suffer considerably after a single day's trading on the NYSE. This cannot be.

Thus, on the day of the Stock Purchase (October 15, 2008), the Individual Defendants' employment contracts with Equity were valid. Northwest does not appear to dispute this *possibility*. Instead, Northwest focusses on what immediately followed the Stock Purchase.[94] According to Northwest, on October 16, 2016, the day after the Stock Purchase, the Individual Defendants were "terminated"—they were no longer employed by Equity, the target corporation—and they were from that point forward employed by First American.[95] To reach

---

[91] *Dansie v. City of Herriman*, 134 P.3d 1139, 1143 (Utah 2006) (emphasis in original).

[92] *Fowler v. Shadel*, 400 F.3d 1016 (7th Cir. 2005) (internal quotation marks omitted).

[93] *Klein v. Board of Tax Sup'rs of Jefferson County, Ky.*, 282 U.S. 19 (1930).

[94] Opposition at 2–4.

[95] *Id.* In the alternative, Northwest makes essentially the same argument about the Individual Defendants becoming First American employees upon signing First American bonus plans in 2012 (Williams and Carrell) and 2014 (Smith). Opposition at 5. Because the legal analysis is the same, that argument will not be treated separately.

this conclusion, Northwest relies on First American statements from the Complaint, other papers, and depositions, and pay statements, emails, and other exhibits.[96] This argument and all its associated citations, however, only form a premise that leads to a false conclusion: i.e., that *if* Northwest shows that the Individual Defendants were hired by First American then the non-compete and non-solicitation provisions were triggered. And *if* those obligations were triggered, the limitation periods are now lapsed.

But this argument yields an absurd result. If being hired by First American triggered the Individual Defendants' non-compete and non-solicitation agreements,[97] then First American itself obliterated the value of the non-competition agreements. And this logic would mean the Individual Defendants breached their agreements not to compete by working for First American, in the same locations, performing essentially similar services, at similar compensation as they had with Equity. This is not a just result. If they were liable to Equity for breaching their agreements, who would bring that suit? Surely not Equity, which was controlled by its sole shareholder, First American. First American would not prohibit work by the valuable employees in the acquired locations.

After the stock purchase, Equity and all the employees associated with it, became part of First American's general corporate purpose. That is, Equity became, according to the undisputed material facts, a division of First American.[98] It was possible for the individual defendants to have contractual obligations to both Equity *and* First American.

On the one hand, the stock purchase left all Equity's assets, including contractual obligations owed to it, intact and separate from First American, the acquiring parent corporation.

---

[96] Opposition at xviii–xxxv, responding to the Motion's Statements of Undisputed Material Facts ¶¶ 29–33.

[97] Acknowledging that Carrell's employment agreement did not include a non-solicitation provision.

[98] Undisputed Material Facts ¶ 26.

But on the other hand, the stock purchase—which made First American the *sole*[99] shareholder— also made Equity part of First American's larger corporate enterprise.

An email exchange between Kevin Lagerwey, First American's head of mergers and acquisitions, and Mike Williams, the representative from Merrill Lynch overseeing the First American retirement plan, underscores the Janus nature of this transaction:

> Mike Williams: "When we spoke yesterday you did not tell me the employees would be terminated w. Utah and hired directly w. First American Title."[100]
>
> Kevin Lagerwey: "That is not the process. First American currently owns 50% of the stock of Equity. We are buying another 45% now with the right to buy the 5% remaining at a time in the future. All employees *will remain employed by Equity Title*, Utah. They *are terminated from Equity* and hired by First American as part of this transaction."[101]

There does not appear to be any Utah case directly on point. *Joyner*, from the Court of Common Pleas of Pennsylvania, seems to be the most factually similar case. In *Joyner*, two employees worked for Joyner Sports Medicine Inc.[102] Both employees entered into non-compete agreements.[103] Eventually, Nova Care Inc., acquired 100 percent of Joyner's stock.[104] "Although the Joyner name continued to be presented to the public, it was immediately clear to the employees of Joyner that they had a new employer."[105] The employees were required to

---

[99] For sake of clarity, the remaining 5% purchased in 2009 is treated as if it were part of the Stock Purchase. *See* Undisputed Material Facts ¶ 27.

[100] October 14, 2008, Email String Among Equity Employees, Orange Coast Title Employees, FATCO Employees, and Representatives from Merrill Lynch at 3, docket no. 235-7, filed July 11, 2016.

[101] *Id.* (emphasis added). Though Northwest argues Lagerwey is referring to two separate entities, "Equity Title of Utah" and "Equity Title Insurance Agency, Inc.," Opposition at xxxii–xxxv, it provides no supporting documentation. The argument is also undermined by Lagerwey's use of "remain."

[102] *Joyner*, 45 Pa. D. & C.4th at 244.

[103] *Id.* at 244–45.

[104] *Id.* at 245.

[105] *Id.*

acknowledge Nova Care's employee handbook;[106] Nova Care unilaterally changed the employees' benefits package;[107] Nova Care discontinued merit-based salary increases;[108] paychecks were issued by another subsidiary of Nova Care, Nova Care Employee Services Inc.;[109] and the employees' W-2 forms reflected Nova Care Employee services Inc. as employer, "while those paid prior to the acquisition were separated on a W-2 showing Joyner as 'employer.'"[110]

The court in *Joyner* "conclude[d] as a matter of law that, as of the acquisition date, [the employees] were no longer employees of Joyner and that they were effectively terminated."[111] The court then calculated the non-compete period starting from the acquisition date.[112] This construction rendered later competition by those employees outside the reach of the non-competition agreement.

First American distinguishes *Joyner* because the contracts in *Joyner* did not have assignability clauses and the Individual Defendants' contracts do.[113] Under Pennsylvania law,

> Strong policy considerations underlie the conclusion that restrictive covenants are not assignable. Given that restrictive covenants have been held to impose a restraint on an employee's right to earn a livelihood, they should be construed narrowly; and, absent an explicit assignability provision, courts should be hesitant to read one into the contract.[114]

---

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.* at 246.

[111] *Id.* at 250.

[112] *Id.* at 250–51.

[113] Reply at 8.

[114] *Joyner*, 45 Pa. D. & C.4th at 248.

The Individual Defendants' contracts, however, were not assigned. After the SPA, Equity remained a viable entity and its interests in contractual assets persisted.

*Joyner*'s flawed reasoning further weakens its value. The *Joyner* court begins its "legal discussion by noting that none of the defendants contest the underlying validity of their employment agreement or the reasonableness of its terms."[115] But then, because it disregards the distinction between an asset purchase and a stock purchase,[116] the court proceeds with a reasonableness analysis. It states: "The point of focus should not be on the relationship between the old employer and the new employer, but rather as between the employee and the new employer."[117] That analysis, however, is better suited for the second prong of a breach of contract claim, i.e. "performance by the party seeking recovery."[118] If the terms of the employment contract were not honored by the parent entity or if the nature of the non-compete changed without consent (to name only two possible scenarios), then the employees could show that the parent corporation had not properly performed its side of the bargain. Thus, the *Joyner* court's conclusion that the employees were "effectively terminated" as of the acquisition date suffers from an incorrect premise. The court, working under the asset purchase case law, looked for renewed consent from the acquired corporation's employees to be bound by the non-compete agreements, when consent, in the context of a stock purchase, is irrelevant. The point of focus

---

[115] *Id.* at 246.

[116] *Id.* at 249 (characterizing the distinction between an asset purchase and a stock purchase as a "distinction without a difference").

[117] *Id.*

[118] *Bair*, 20 P.3d at 392.

*should* be on the relationship between the old employer and the new employer, specifically on how one acquired the other.[119]

*Corporate Express Office Products, Inc. v. Phillips*,[120] provides better analysis. In *Corporate Express*, two employees signed a non-compete with Bishop Office Furniture Company.[121] The non-compete prohibited those bound by it from competing with Bishop or from soliciting Bishop's customers for one year. Corporate Express of the South, Inc. (CES) eventually purchased 100 percent of Bishop's stock.[122] The stock purchase agreement listed the employees' non-compete agreements.[123] Before and after the stock purchase, CES and Bishop both sold furniture and business equipment.[124] CES continued to operate the business under the Bishop name until one year later when CES and Bishop merged.[125] Shortly thereafter CES merged with another related entity and changed its name to Corporate Express Office Products, Inc.[126] After the merger, the employees bound by the non-compete terminated their employment with Corporate Express Office Products, Inc.[127] The employees then went to a different employer, allegedly in violation of their non-competition agreements.[128]

---

[119] *See Siemens Medical Solutions Health Services Corp. v. Carmelengo,* 167 F.Supp.2d 752, 759–60 (E.D. Penn. 2001) (finding similar issues with the *Joyner* decision and determining "that the Supreme Court of Pennsylvania would decline to follow [the *Joyner*] court's reasoning.").

[120] 847 So.2d 406 (Fla. 2003).

[121] *Id.* at 407.

[122] *Id.*

[123] *Id.*

[124] *Id.* at 408.

[125] *Id.* at 407.

[126] *Id.*

[127] *Id.* at 408.

[128] *Id.*

Corporate Express Office Products, Inc. brought suit against the former employees and their new employer "for unlawful use of trade secrets and breach of the noncompete agreements."[129] The former employees "asserted that Corporate Express had no legal right to enforce the noncompete agreements because Corporate Express was not their employer when the agreements were made."[130]

The court held:

> [T]here is a clear distinction between the transfer of an asset of a corporation, such as a franchise agreement, and a transfer of the stock in a corporation itself.... With a stock purchase, the corporation whose stock is acquired continues in existence, even though there may be a change in its management.... [T]he fact that there is a change in ownership of corporate stock does not affect the corporation's existence or its contract rights, or its liabilities.[131]

The employees, therefore, were bound to not compete with Corporate Express because of the non-compete agreements they signed with Bishop.

Although the Individual Defendants focus on the "termination" argument and related citations, their argument is essentially the same as that made by the *Corporate Express* employees; i.e. that the parent corporation cannot enforce the non-compete because the non-compete agreement was between them and another entity. But First American, as Equity's sole shareholder, could "hire" the Individual Defendants to get them, as First American alleges,[132] on its payroll system without destroying Equity's contractual assets. Thus the Individual Defendants' contracts were valid on October 15, 2008, the day of the stock purchase, and they were not terminated on October 16, 2008, the date they were "hired" by First American.

---

[129] *Id.*

[130] *Id.*

[131] *Id.* at 412 (internal quotation marks omitted).

[132] Excerpts from Deposition of Kurt Aaron Andrewsen at 56–60, docket no. 235-6, filed July 11, 2016.

**(2) The Individual Defendants' employment contracts remained in force after the merger.**

The Agreement and Plan of Merger states that

The board of directors and managers of [First American and Equity] deem[] it advisable for the general welfare of [First American and Equity] and [their] shareholders, that [First American and Equity] merge into a single entity pursuant to [the Agreement and Plan of Merger] and the applicable laws of the States of Utah and Delaware.[133]

Under Utah law, all assets, including contractual obligations owed to the corporations, transfer and vest in the surviving corporation by virtue of the merger, without any other action by any party:

(1) When a merger takes effect:
   ...
   (b) The title to all real estate and other property owned by each corporation party to the merger is transferred to and vested in the surviving corporation without reversion or impairment. The transfer to and vesting in the surviving corporation occurs by operation of law. No consent or approval of any other person is required in connection with the transfer or vesting unless consent or approval is specifically required in the event of merger by law or by express provision in any contract, agreement, decree, order, or other instrument to which any of the corporations so merged is a party or by which it is bound.[134]

The Utah Supreme Court interpreted similar statutory language in *Aetna Life and Cas. v. United Pac. Reliance Ins. Companies*.[135] The court held that

inasmuch as the merger of corporations results in the transfer of liability of the merged corporation . . . and also all of its rights, the logical conclusion is that the surviving corporation . . . simply stands in the same position as that occupied by the merged corporation . . . prior to the merger.[136]

---

[133] Articles of Merger and Agreement and Plan of Merger, docket no. 217-9, filed June 9, 2016.

[134] Utah Code Ann. 1953 § 16-10a-1106(1)(b).

[135] 580 P.2d 230 (Utah 1978) (interpreting the old Business Corporation Act, now-repealed Utah Code 16-10-71(d)).

[136] *Aetna Life*, 580 P.2d at 232.

The Tenth Circuit also stated that "[i]n the case of a merger . . . the surviving corporation automatically succeeds to the rights of the merged corporations to enforce employees' covenants not to compete."[137]

Delaware law similarly states:

(a) When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 [sic]of such corporations, as the case may be, *possessing all the rights, privileges, powers and franchises* as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; *and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any* of said constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations....[138]

The United States district court in Delaware interpreted this to mean: "A statutory merger . . . results in a combination of the two corporations with the surviving corporation attaining the property, rights, and privileges of the absorbed corporation, as well as retaining its own property, rights, and privileges."[139]

Even without these statutory provisions, Smith's and Williams's employment contracts explicitly provide that "[t]he terms, conditions, and obligations of this Agreement shall inure to

---

[137] *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990).

[138] Del. Code Ann. tit. 8, § 259 (2016) (emphasis added).

[139] *Texaco Refining and Marketing, Inc. v. Delaware River Basin Commission*, 824 F. Supp. 500, 507 (D. Del. 1993).

the benefit of, and be binding upon the parties hereto and their respective heirs, executors, administrators, *successors*, and assigns thereof."[140]

Neither party disputes that the merger took place. And Northwest does not resist the case law for a statutory merger. Instead, Northwest argues that at the time of the merger there was nothing left for First American to enforce because the agreements had long lapsed.[141]

The Individual Defendants' employment agreements survived the stock purchase and remained in force between October 15, 2008, until the merger on October 12, 2012. Thus, upon merging, First American stood "in the same position as that occupied by"[142] Equity to enforce the Individual Defendants' non-compete provisions, and for Smith and Williams, the non-solicitation provisions.

**Smith and Williams breached the non-solicitation provisions of their employment agreements; and Williams and Carrell breached the non-compete provisions of their employment agreements.**

First American only partially succeeds in showing that the Individual Defendants breached their contracts.

**(1) Smith and Williams violated the non-solicitation provisions of their employment agreements.**

Carrell does not have a non-solicitation provision in her employment contract. Smith and Williams do. Their non-solicitation agreements state:

> During his employment with Equity, and for a period of one (1) year thereafter, [Smith or Williams], on behalf of himself or any other person or entity, shall not hire, attempt to hire, recommend for hire, or employ, directly or indirectly, any employee of Equity. During this one-year period of time, [Smith or Williams] shall not encourage or induce any employee of Equity to resign from Equity or

---

[140] Undisputed Material Facts ¶¶ 8, 16 (Emphasis added).

[141] Opposition at 1.

[142] *See Aetna Life*, 580 P.2d at 232.

assist any other employer in recruiting or hiring any employee away from Equity.[143]

Both Smith and Williams are owners of Northwest Title.[144] Northwest Title employs the 26 former First American employees who left First American to work for Northwest,[145] in violation of their non-solicitation provisions.[146] Furthermore, Smith directed numerous employees to Doug Smith, who later hired them on behalf of Northwest.[147] This constitutes assisting another employer in recruiting or hiring a First American employee.

### (2) Williams and Carrell breached the non-compete provisions of their employment agreements; Smith did not.

Jeff Williams's non-compete agreement states:

During his employment with Equity, and for a period of one (1) year thereafter, if terminated for cause, Williams shall not, directly, or indirectly, either as an employee, employer, consultant, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Equity, covering an area in all directions 100 miles from any of the offices of Equity. If Williams is terminated without cause, this non-competition provision shall not apply after such termination.[148]

Kristi Carrell's non-compete agreement states:

During your employment with Equity Title and for a period of one year thereafter, you may not participate in any competing title insurance or escrow business within a 40-mile radius of any of Equity Title's offices.[149]

---

[143] Undisputed Material Facts ¶¶ 7, 14.

[144] *Id.* ¶¶ 56–57.

[145] *Id.* ¶ 58.

[146] For reasons stated *infra*, Williams did not avoid his duty to not solicit First American employees by failing to give notice.

[147] *Id.* ¶¶ 61–65.

[148] *Id.* ¶ 12.

[149] *Id.* ¶ 20.

Both Williams and Carrell admit to "providing title insurance, escrow, and closing services on behalf of Northwest Title in direct competition with" First American.[150] They also admit to working within the geographical scope of the non-compete agreements.[151]

Because he did not give 30 days' written notice to First American, Williams attempts to avoid the non-compete and the non-solicitation provisions.[152] His contract states: "Williams may terminate his employment with Equity at any time upon 30 days' prior written notice. Upon such termination, the one-year period of non-competition and non-solicitation described in Section 7 and Section 8 above shall apply."[153] The requirement of 30 days' advance notice is for First American's benefit, and is not a limitation on the effectiveness of the non-competition and non-solicitation clauses. First American might have (but has not asserted) a claim for his violation of his obligation to give 30 days' advance notice. And allowing Williams to avoid his contractual obligations for failing to resign with 30 days' notice would, in effect, reward Williams for breaching the resignation notice provision. Williams is bound by both the non-solicitation and the non-compete agreement.

By contrast, Smith is not bound by the non-competition agreement. His agreement is nearly identical to Williams's except it does not include the voluntary termination stopgap provision referenced in the previous paragraph. It only states:

> During his employment with Equity, and for a period of one (1) year thereafter, if terminated for "Cause" (as defined in Section 10 below), Smith shall not, directly, or indirectly, either as an employee, employer, consultant, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Equity, covering an area in all directions 100 miles from any of the offices of Equity. If Smith is

---

[150] *Id.* ¶¶ 43–55.

[151] *Id.*

[152] Motion for Summary Judgment and Memorandum in Support at 15–16, docket no. 163, filed on April 19, 2016; referenced in the Opposition at 24.

[153] Undisputed Material Facts ¶ 15.

terminated without Cause, the period for which he shall not compete with Equity as described above shall be reduced to six (6) months from the date of his termination.[154]

By its terms, it is only effective if he is terminated by First American. The change to later include the voluntary termination provision in Williams's employment agreement may evidence First American's acknowledgment that without it, the non-compete would not be triggered by voluntary resignation. Thus, Smith's non-compete agreement could only be triggered "if terminated" by First American. Smith was not terminated by First American.[155] He voluntarily resigned.[156]

## CONCLUSION

This is a very narrow decision. These are the conclusions:

    1.     The Individual Defendants' employment contracts survived the stock purchase and the merger, thus transferring the right to enforce those contracts to First American;

    2.     Smith and Williams breached the non-solicitation provisions of their employment contracts; and

    3.     Williams and Carrell breached the non-compete provisions of their employment contracts, and Smith did not.

This order does not resolve all issues related to validity of the contracts, such as reasonableness of scope and duration; First American's performance; or whether First American suffered damages.

---

[154] *Id.* ¶ 5.

[155] *Id.* ¶¶ 42, 65.

[156] *Id.* ¶ 65.

## ORDER

THEREFORE, the Plaintiffs' Motion for Partial Summary Judgment and Memorandum in Support[157] is GRANTED IN PART and DENIED IN PART. The rights to enforce the Individual Defendants' employment agreements transferred to First American by operation of law as part of the merger. Jeff Williams and Kristi Carrell breached the non-compete provisions of their employment agreements. Mike Smith did not. And Jeff Williams and Mike Smith breached the non-solicitation provisions of their employment agreements.

Dated October 18, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[157] Docket no. 217, filed June 9, 2016.