WOOD BALMFORTH LLC
Mary Anne Q. Wood (3539)
Stephen Q. Wood (12403)
60 East South Temple, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 366-6060
Facsimile: (801) 366-6061
Email: mawood@woodbalmforth.com
        swood@woodbalmforth.com
*Attorneys for Defendants*

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN TITLE COMPANY, LLC,<br>     Plaintiffs,<br><br>vs.<br><br>NORTHWEST TITLE INSURANCE AGENCY, LLC; MICHAEL SMITH; JEFF WILLIAMS; AND KRISTI CARRELL,<br>     Defendants. | **MOTION TO RECONSIDER OR TO RECONSIDER AND CERTIFY TO THE UTAH SUPREME COURT ORDER GRANTING IN PART AND DENYING IN PART FIRST AMERICAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Civil No. 2:15-cv-00229<br><br>Judge David Nuffer<br><br>Magistrate Judge Paul M. Warner |

### I.    INTRODUCTION.

"There are three major grounds that justify reconsideration of a motion: (1) an intervening change in the controlling law, (2) the availability of new evidence, and (3) the need to correct clear error or prevent manifest injustice."[1]

---

[1] *Servants of Paraclete v. Does*, 204 F.3d 1005, 1009 (10th Cir. 2000).

Respectfully, there are several errors in the Court's October 18, 2016 Order (the "Order"), including but not limited to the following.  Those errors have created manifest injustice to the Defendants.  Defendants therefore seek reconsideration of the Order.

## II.    ARGUMENT.

### A.    THE COURT RULED WITHOUT ARGUMENT, RELYING UPON NEW ARGUMENTS RAISED IN FATCO'S REPLY WITHOUT GIVING DEFENDANTS AN OPPORTUNITY TO RESPOND.

After being given months to do so, FATCO filed its reply memorandum on October 3, 2016.  FATCO did not submit its motion for decision.  In fact, FATCO and Defendants both had requested oral argument.  Thus Defendants expected an argument to be scheduled.

FATCO's reply improperly included new argument.  Defendants were completing a surreply memorandum to address the new argument, and, in preparation for a motion for leave to file it, had sought FATCO's stipulation.[2]

The new argument was that FATCO and Equity were joint employers between the October, 2008, Stock Purchase Agreement ("SPA"), and the November, 2012, FATCO/Equity merger.  At first, FATCO had pled and testified that the Individual Defendants became FATCO employees in 2008, and that their Equity employment contracts transferred to FATCO.[3]  When it became clear that FATCO did not assume the contracts or purchase Equity's assets,[4] FATCO did an about face, and began asserting without amending its pleadings that the Individual Defendants remained employees of Equity until the employment contracts passed to FATCO as a result of that merger.[5]

---

[2]    Ex. 1, Email from Steve Wood to Matthew Lalli, dated October 17, 2016.

[3]    *See* Defendants' Memorandum in Opposition to FATCO's Motion for Partial Summary Judgment ("Opp. Memo."), Responses to Facts Nos. 29, 31, 32, 33.

[4]    *Id.* at Response to Fact No. 26.

[5]    *See, e.g.*, Plaintiffs' Motion for Partial Summary Judgment and Memorandum in Support ("FATCO's Motion") at Facts Nos. 29, 31, 32.

Confronted with its own binding judicial admissions that the Individual Defendants were employed by FATCO after the 2008 stock purchase, FATCO asserted for the first time in their reply that "[t]he Individual Defendants easily and reasonably could have been considered employees of both Equity Title and First American."[6]  Again, there was no motion to amend the complaint.

When a movant introduces new material or new argument in a reply, a court avoids error by granting the non-movant an opportunity to file a surreply, or by refusing to rely upon the new argument.[7]

FATCO offered no legal support for its new "joint employer" theory, and no evidence which supported it.  Nevertheless, the Court appears to have adopted some form of it.  Defendants had asked FATCO to stipulate to a surreply.  However, because the Court ruled, with mutual requests for oral argument pending and without the motion having been submitted, Defendants were deprived of the opportunity to respond to the new argument.  This was error.

B. **THE ORDER CORRECTLY SETS OUT RELEVANT DIFFERENCES BETWEEN A STOCK PURCHASE AND AN ASSET PURCHASE, BUT CONTAINS OTHER FACTUAL AND LEGAL ERRORS.**

1. **As Stated in The Order, Corporate Shields Remain Intact in A Stock Purchase, Entities Remain Separate, and Contracts Do Not Pass to The Stock Purchaser.**

The Order correctly spells out the difference between stock purchases and asset purchases under Utah and Delaware law.  In a stock purchase, "the corporation's assets remain titled in the original corporation's name."[8]  Further, "[i]n a stock purchase the interests remain separate and

---

[6]    Reply Memorandum in Further Support of First American's Motion for Partial Summary Judgment ("FATCO's Reply") at 10.

[7]    *Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003).

[8]    Order at 15.

distinct."[9]  "[A]ny contractual obligations owed the target corporation remain the target corporation's after a stock purchase.[10]

The only error in this portion of the Order is the assumption that Pennsylvania law differs, and that, under Pennsylvania law, there is no distinction between an asset purchase and a stock purchase.[11]  In fact, Pennsylvania law appears to be the same on this point as Utah and Delaware law.[12]

In a stock purchase, without more, the stock purchaser becomes a mere stockholder.[13]  In this case, however, there was more.  As discussed *infra*, FATCO chose not to assume Equity's outstanding contracts and leases, thereby avoiding the obligations of those agreements.  But following the 2008 stock purchase, former Equity employees did not simply continue working as they had before.  FATCO took control and began consolidating Equity into FATCO.

Though the relevant offices still bore Equity's name, the employees therein were made FATCO employees.[14]  It is undisputed that about a third of those former Equity employees were

---

[9]     *Id.*
[10]    *Id.* at 16.
[11]    *Id.*
[12]    *See, e.g.*, *Missett v. Hub Int'l Pennsylvania, LLC*, 2010 PA Super 178, 6 A.3d 530, 535 (2010) (discussing distinction between stock and asset purchases, and its effect on enforceability of restrictive covenants); *J.C. Ehrlich Co. v. Martin*, 2009 PA Super 127, ¶ 12, 979 A.2d 862, 866 (2009) (discussing differing effect of stock purchase and asset purchase on identity of employer); *Tayar v. Camelback Ski Corp.*, 957 A.2d 281, 289 (Pa. Super. 2008) (corporation is separate legal person distinct from shareholders); *Commonwealth ex rel. Attorney Gen. v. Monongahela Bridge Co.*, 216 Pa. 108, 208, 64 A. 909, 912 (1906) (corporation is entity irrespective of who owns its stock).  The distinction between a stock purchase and an asset purchase was immaterial in *Joyner Sports Med. Inst. Inc. v. Stejbach*, 45 Pa. D. & C.4th 242, 249 (Com. Pl. 1999), *aff'd sub nom.* *Joyner Sports v. Stejbach*, 769 A.2d 1215 (Pa. Super. Ct. 2000), only because in that case, as here, the stock purchaser had chosen to make the target company's employees its own, rather than leaving them with the target company.
[13]    Order at 15.
[14]    Opp. Memo. at Responses to Facts Nos. 29, 31, 32, 33.

terminated as part of the consolidation.[15]  It is undisputed that numerous functions were removed from those offices and performed by FATCO.[16]  It is undisputed that benefits changed, job titles were changed and former Equity managers had to report to FATCO management.[17]

> **2.     The Result of FATCO's Decision Not to Become a Party to Defendants' Equity Employment Contracts Was Not "Absurd," It Was the Result Chosen by FATCO and Was Totally Consistent with Its Interests and Practices.**

The Order rejects the conclusion that the Individual Defendants' employment contracts with Equity terminated when their employment with Equity terminated, because that would produce an "absurd result."  Factually, however, there was no absurdity.  Furthermore, even if the result of the termination of the contracts had been absurd, the absurdity rule has no application here, as discussed in the next section.

The Court reasons that the result was "absurd" because the Individual Defendants were violating their noncompetition agreements by working for FATCO in the first year following the stock purchase, but Equity could not sue for this "violation" because it was controlled by FATCO. This, according to the Order, would not be "just."

However, as the Court recognizes in the very next paragraph, by that time, Equity and FATCO had a "common corporate purpose."  The companies were "competing" in name only. They were already actively consolidating.  There would be no conceivable reason for Equity to want to sue its former employees for working for FATCO.

---

[15]     Opp. Memo. at Additional Material Undisputed Facts Nos. 8, 69-72; ECF 225-1, Appendix A, Reply to FATCO's Response to Defendants' Statement of Facts ("Reply Def. MSJ") at Statement No. 19.

[16]     Opp. Memo. at Additional Fact No. 69-72; Reply Def. MSJ at Statement No. 45 and Response and Reply thereto.

[17]     Opp. Memo. at Additional Fact No. 6; Reply Def. MSJ at Statement No. 45 and Response and Reply thereto.

In fact, Equity and FATCO had purposefully created such a "competing" situation in the case of Mark Webber.  Mr. Webber signed an employment agreement with Equity in 2003 which forbade competition both during and after his employment with Equity.[18]  In 2004, Mr. Webber, while still serving as President of Equity, entered into an employment agreement with FATCO to manage FATCO's Utah operations.  This agreement, like FATCO's typical contract, followed California law by prohibiting competition only during his employment with FATCO, but not afterward.[19]  Mr. Webber performed under both contracts for years.  He was, in fact, "competing" with Equity in the same sense as the "competition" in the Court's hypothetical.  Obviously, neither Equity nor FATCO considered such an arrangement to be absurd or contrary to their interests.

If, however, Mark Webber or any of the Individual Defendants had gone to work for a title company other than FATCO in the first year after the 2008 stock purchase – a title company which, unlike FATCO, was actually competing with Equity – Equity could have sued on the old employment contracts, and FATCO would likely have instructed Equity to do so.  This is a perfectly just and reasonable result.

The termination of the Individual Employees' contracts with Equity was precisely what FATCO intended when it made them FATCO employees in 2008 without assuming their Equity employment contracts.  As is common in such transactions, the 2008 SPA, Exhibit 4, contains Section 2, Representations Concerning The Company, which, *inter alia*, identifies rights and obligations of the target company, warranting that no other obligations exist and/or that contracts are not in breach.

---

[18]    Ex. 2, Employment Agreement between Equity Title Insurance Agency, Inc., and Mark S. Webber, dated Sept. 15, 2003, at ¶ 10.
[19]    Ex. 3, Employment Agreement between First American Title Insurance Company and Mark S. Webber, dated August 17, 2004, at ¶ 5.

Thus, in Paragraph 2.9(a), the SPA defines several types of "material contracts" to which Equity is a party, including employment contracts and leases.  In Schedule 2.9(a), the SPA identifies 39 such "such material contracts," most of which are leases.  In Paragraph 2.9(b), the SPA warrants that no defaults exist.

FATCO chose not to assume any of these "material contracts."  Obviously, FATCO did not wish to assume direct liability under those contracts, and relied on the corporate form to keep those liabilities in Equity's name, and not its own.   There is no language in the SPA transferring contracts to FATCO, and FATCO has produced no additional documentation making such transfers.  Had FATCO wished to keep employment contracts in force, it had two alternatives.  It could have (1) assumed them, or (2) left the employees in the employ of Equity – which still existed – until the time of the merger.  FATCO chose to do neither.

Furthermore, the only employment contracts even identified in the SPA as being in force and effect are those of Mike Smith and Jeff Williams.[20]  But, the SPA does not stop there.  It also states, "Except as set forth in Schedule 2.9(a), the Company is not bound by any oral or written contract (i) relating to the employment of any Person. . . ."[21]  In light of this plain disclaimer of any employment agreements other than the Smith and Williams contracts, the Court committed error in finding that Ms. Carrell was bound by a non-compete obligation.  This language, without more, should be fatal to FATCO's current claim that Kristi Carrell's employment contract with Equity survived even until the 2008 stock purchase.

When FATCO made the Individual Defendants its own employees on October 16, 2008, it did so knowing that it had not assumed their Equity employment contracts, or any of the obligations

---

[20]    Ex. 4, SPA at Schedule 2.9(a).
[21]    *Id.* at Para. 2.9(a).

associated with those contracts.  FATCO began altering their compensation and their duties and authority as it wished, and it did so.[22]

FATCO should have been bound by its repeated judicial admissions that it made the Individual Defendants its own employees – not co-employees with Equity – in 2008.  That should have been the end of the discussion.  Equity allowed its employees to become FATCO employees. Equity was no longer employing the Individual Defendants pursuant to their old contracts, and the Individual Defendants were no longer working for Equity pursuant to those contracts.  FATCO has presented no theory under which a contract can continue to exist for an additional four years until the time of the merger, when neither party is performing it, and, instead, the parties have acted inconsistently with it.  A "common corporate purpose" does not make parties to a contract interchangeable or dissolve the corporate shield.  The Order, however, uses the notion of "general corporate purpose" to dissolve the corporate form, allowing FATCO to claim rights while simultaneously avoiding liabilities, and treating employees as co-employees of separate entities simply because they share a "general corporate purpose."  There is no authority to support this either.  Nor does the Order cite any such authority.  To Defendants' knowledge, there is no such authority.  At the least there is a factual question of whether the contracts were abandoned.

Furthermore, FATCO's decision to forego any rights associated with the old Equity employment contracts was not "absurd," and did not "obliterate"[23] anything that FATCO valued at the time.  Rather, it was entirely consistent with FATCO's practices.  FATCO is a California company.  In California, employers may not forbid post-employment competition or solicitation to

---

[22]    Opp. Memo. at Additional Facts Nos. 1-72.
[23]    Order at 17.

hire.  Employers can be sued even for requiring employees to sign such agreements.[24]  Therefore, none of the FATCO documents which the Individual Defendants were required to sign contains such provisions.[25]  Mark Webber's FATCO contract contains no such provisions.  Kurt Andrewsen was the Human Resources Manager at the time of the events giving rise to this lawsuit.  At his deposition, he could not identify anyone in FATCO's Southwest Division which includes Arizona, Utah, and other states, who had been asked to sign such provisions.[26]

In summary, FATCO chose to avoid the liabilities in Equity's outstanding contracts by declining to assume them.  FATCO chose to use corporate law to separate itself from additional liabilities.  To the extent FATCO considered the question at all, it chose to forego the right to sue employees for post-employment competition or solicitation.  This was the price of avoiding the liabilities, not just of employee contracts but also leases and other Equity liabilities.  But, it was also not FATCO's practice to demand such provisions from its employees.

3.    **The Absurdity Rule Applies When Construing Ambiguous Contracts, Which Was Not Done Here; Courts May Not Otherwise Rewrite Parties' Contracts.**

When a court is construing ambiguous provisions in a contract, several rules of construction apply, including the rule that absurd results should be avoided.[27]

---

[24]    *See, e.g.*, *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 189 P.3d 285 (2008).

[25]    *See generally*, Exhibits B and C to Complaint.

[26]    Ex. 5, Excerpts from Deposition of Kurt Aaron Andrewsen at 22:1 – 27:8; 119:16 – 120:1. Defendants have been informed that, since the events giving rise to this lawsuit, FATCO has paid extra consideration to some Utah employees to induce them to sign post-employment noncompetition agreements.  However, according to the cited testimony, this has happened only a handful of times.  It was clearly not FATCO's common practice in 2008.

[27]    *See, e.g.*, Restatement (Second) of Contracts § 203 (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *Osguthorpe v. Wolf Mountain Resorts, L.C.*, 2013 UT 12, 322 P.3d 620, 623 (refusing contract interpretation yielding absurd result); *Glenn v.*

However, the Order does not construe ambiguous provisions in a contract.  There is no ambiguity as to the parties to the Individual Defendants' Equity employment contracts.  FATCO was not a party.  There is no ambiguity in the SPA regarding whether or not those contracts were transferred to FATCO in 2008.  They were not.  Though Mike Smith's and Jeff Williams' old contracts inured to the benefit of "successors" and "assigns," FATCO never became an assignee, and did not become a "successor" until the merger, four years after the parties had ceased to perform the old Equity contracts, and they were thereby terminated, abandoned, or discharged.  The absurdity rule simply does not apply here, and it was error to employ it.

However, – because the Court felt that the results of applying unambiguous contracts were "absurd" – the Order effectively rewrites the contracts.  The Order gives FATCO rights without liabilities, and holds the Individual Defendants to be bound for four years to perform contracts for a non-party who was neither a successor nor an assignee.

This was further error because it violates the rule that courts may not rewrite parties' agreements, or allow parties to rewrite them, even where the court believes their results to be harsh or unfair.[28]  "[A] court may not make a better contract for the parties than they have made for themselves."[29]  "[I]t is not for a court to rewrite a contract improvidently entered into at arm's length or to change the bargain indirectly on the basis of supposed equitable principles"[30]  Rather, "[w]here the terms and conditions of a contract are not unconscionable, and no fraud, duress, or

---

*Reese*, 2009 UT 80, 225 P.3d 185, 190 (choosing contract interpretation which "allows each provision to have effect and does not produce absurd or harsh results").

[28]    *Zions Mgmt. Servs. v. Record*, 2013 UT 36, 305 P.3d 1062, 1071 (court will not rewrite unambiguous contract, or allow parties to rewrite it).

[29]    *Ted R. Brown & Associates, Inc. v. Carnes Corp.*, 753 P.2d 964, 970 (Utah Ct. App. 1988).

[30]    *Dalton v. Jerico Const. Co.*, 642 P.2d 748, 750 (Utah 1982).

misrepresentation is claimed, the courts must enforce all contracts as the parties have made them and not as the court thinks they should have been made."[31]

### C.    THE ORDER IMPROPERLY DECIDES DISPUTES AND/OR DRAWS INFERENCES IN FAVOR OF THE MOVANT.

The Order acknowledges that disputes of material fact preclude summary judgment, and that the record must be viewed and all reasonable inferences drawn in Defendants' favor.[32]  But, FATCO was also allowed to raise its "joint employer" theory on reply, and prevailed on that theory.

At most, however, FATCO created a material dispute, which should not have been decided on summary judgment.  Voluminous evidence indicates that, prior to the November, 2012, merger, Equity had ceased to be the Individual Defendants' employer, and that their contracts had terminated.  That evidence includes:

- All FATCO's judicial admissions, and the concurring documentary evidence cited in Defendants' Opposition.[33]

- Kurt Andrewsen's specific testimony that Kristi Carrell became "an employee of FATCO rather than Equity" on October 16, 2008.[34]

- Mike Smith's testimony that Kurt Andrewsen told him, prior to the 2012 merger that he had no contract with Equity Title.[35]

---

[31]    *Strohm v. ClearOne Commc'ns, Inc.*, 2013 UT 21, 308 P.3d 424, 437 (quoting *Johnson v. Geddes*, 49 Utah 137, 161 P. 910, 915 (1916)).

[32]    Order at 12-13.

[33]    Opp. Memo at Responses to Facts Nos. 29, 30, 31, 32, 33, 38.

[34]    Opp. Memo. at Response to Fact. No. 32.

[35]    Ex. 6, Excerpts from Deposition of Michael M. Smith at 183:6-11.

- The fact that the SPA states that, in 2008, no employment contracts were then in force other than the contracts identified in the SPA, and Kristi Carrell's contract was not identified.

- The fact that, effective January 1, 2012 – ten months prior to the merger – the Individual Defendants each[36] had been required to enter into contracts designating their new positions within FATCO and setting their compensation.  They were no longer even working in offices nominally designated as "Equity" offices, and there was nothing to tie them to Equity or their former employment contracts, or to suggest any kind of co-employment after January 1, 2012.  This was ten months prior to the merger.[37]

Also, the Order points to emails sent by Mike Smith in 2011, in which he opines that another Equity employment contract was enforceable by FATCO.[38]  Defendants presented evidence that Mike Smith was not privy to the terms of the 2008 SPA.  It is undisputable he was required to sign a signature page on behalf of Equity, but was not provided a copy of the SPA.  He could not have known that the contracts did not pass to FATCO.[39]  Yet, the Court apparently infers from those emails that all the Equity contracts remained in force in 2011.

The Court also draws inferences favorable to FATCO from Mike Smith's ambiguous 2011 email exchange regarding his car allowance.[40]

---

[36]     In their Opposition, Defendants mistakenly attached Mike Smith's 2014 Bonus Plan. It was clear from the text, however, that Mr. Smith entered into a FATCO Bonus Plan effective January 1, 2012, like the other Individual Defendants.  It is attached as Exhibit 7.
[37]     Opp. Memo. at Responses to Facts Nos. 27, 30, 31, 32, 38.
[38]     Order at 8-9.
[39]     Opp. Memo. at Responses to Facts Nos. 26, 40, 41, 42, 43.
[40]     *See* Opp Memo. at Responses to Facts Nos. 38, 39.

Similarly, the Court points to the email from Kevin Lagerwey in which he stated that Equity employees "are terminated from Equity and hired by First American as part of this [2008] transaction." But, he also stated, "All employees will remain employed by Equity Title, Utah."[41]

Defendants had offered evidence showing that these statements were not contradictory. "Equity Title, Utah" was not the entity with whom the Individual Defendants had contracted, which was Equity Title Insurance Agency, Inc. FATCO's CEO had testified that it was a term used to identify a "location" within FATCO.[42] Nevertheless, the Court drew from this email that the transaction was a "Janus" transaction. Considering all the other evidence, this was not a reasonable inference. But, even if it were reasonable, it should not have been made in FATCO's favor, in order to support the improper resolution of a disputed fact.

> **D.    THE _JOYNER_ QUESTION SHOULD BE CERTIFIED TO THE UTAH SUPREME COURT.**
>
> **1.    The Order Misreads the Relevant Cases.**

The Order misreads the key cases relevant to the issue of whether the Individual Defendants' employment contracts survived the stock purchase and were enforceable at the time of the merger.

First, the Order misreads _Joyner Sports Medicine Institute, Inc. v. Stejbach_.[43] The Order rejects _Joyner_, asserting that the reasoning in _Joyner_ is "flawed" and in conflict with Utah law because it disregards the distinction between a stock purchase and an asset purchase, and focuses instead on the "relationship between the employee and the new employer."[44]

---

[41]    Order at 18.
[42]    Opp. Memo. at Response to Fact No. 33.
[43]    45 Pa. D. & C.4th 242.
[44]    Order at 15, 20.

However, the Order reads *Joyner* too broadly and ignores the most critical fact in that case—the court's finding that after the stock purchase, the acquiring company's actions caused the employees to be effectively terminated from the original employer and instead become employed by the acquiring company.[45]  It was within this specific context—where there is a change in employers—that the court in *Joyner* concluded that the difference between a stock purchase and an asset purchase is a "distinction without a difference."[46]  The court's own language makes it clear that the court's reasoning flows from this change in employers: "The point of focus should not be on the relationship between the **old employer** and the **new employer**, but rather as between the employee and the **new employer**."[47]

Thus, under this reasoning, the *Joyner* court properly held that whether the acquisition was accomplished by a stock purchase or asset purchase, the restrictive covenants in the employment contracts were triggered by the change in employers and began to run as of the acquisition.[48]

This interpretation of *Joyner* is supported by the reasoning of other Pennsylvania courts,[49] including *Siemens Medical Solutions v. Health Services Corp.*[50]  The Order relies on *Siemens* for

---

[45]  *Joyner Sports Medicine Institute Inc.*, 45 Pa. D. & C.4th at 245 (enumerating actions by the acquiring company that caused this change in employment, such as new benefits package, new employment handbook, new employer identified on paychecks, etc.).

[46]  *Id.* at 249.

[47]  *Id.* (emphasis added).

[48]  *Id.* at 250–51.

[49]  *See, e.g. Am. Homecare Supply Mid-Atl. LLC v. Gannon*, No. 09 CV 8207, 2009 WL 6340111 (Pa. Com. Pl. Dec. 15, 2009) (distinguishing *Joyner*, in part, because in *Joyner*, the acquiring corporation's actions effectively terminated the employee's employment with the original employer, while in that case, the evidence showed that the employee remained employed by her original employer); *J.C. Ehrlich Co.*, 979 A.2d at 866 (holding that consent or assignment was not necessary for a non-compete provision to be enforceable following a stock sale only after finding that there was no suggestion that the employee's obligations or duties changed "in any material respect" after the acquisition, and "the record clearly establishes" that the employee remained employed by the original employer).

[50]  167 F. Supp. 2d 752 (E.D. Pa. 2001).

the proposition that the court's focus should be only on the relationship between the old and new employers and how one acquired the other (i.e., whether the acquisition was through a stock purchase or asset purchase), and therefore the reasoning in *Joyner* is wrong.[51]  However, the Order misinterprets *Siemens* too.

In *Siemens*, the District Court for the Eastern District of Pennsylvania did not focus merely on the mode of acquisition.  While it held that a restrictive covenant remained enforceable following a stock purchase, it did so only after first determining that there had been no change in the defendant's employer.[52]  The court reviewed *Joyner* and compared the evidence in *Joyner* showing that the employee had changed employers with the lack of such evidence in the defendant's situation.  The court then concluded that it found "nothing significant enough to conclude that [the defendant] no longer worked for the entity with whom he signed his original agreement."[53] Significantly, the court also quoted the language from *Joyner* about the need to focus on the relationship between the employee and the new employer, and predicted that the Pennsylvania Supreme Court would hold that the "old" employer and the "new" employer in that case are "one and the same."[54]

Moreover, contrary to the assertion in the Order, the court did not conclude that the Supreme Court would decline to follow the reasoning in *Joyner* in all cases; the court merely predicted that the Supreme Court would decline to follow the reasoning in *Joyner* only "to the extent" that it might conflict with this determination about the identity of the defendant's employer.[55]

---

[51]    Order at 20-21 & n.119.
[52]    *Siemens Medical Solutions Health Services Corp.*, 167 F. Supp. 2d at 759.
[53]    *Id.*
[54]    *Id.*
[55]    *Id.* at 759–760; *cf.* Order at 21 n.119.

Finally, after rejecting *Joyner*, the Order relies on *Corporate Express Office Products, Inc. v. Phillips*[56] for "better analysis."[57]  But the Order misinterprets that case as well.  *Corporate Express* does not support the Order's assumption that in a stock purchase, restrictive covenants remain enforceable regardless of the employee's employment status following the acquisition.  Instead, the court in *Corporate Express* focused solely on the type of acquisition because, as the Order's recitation of the facts makes clear, there was no evidence in that case that the defendants were terminated or became employees of the acquiring corporation.[58]  Thus, the reasoning of *Corporate Express* is consistent with the reasoning in *Joyner*, and both cases support Defendants' position in this case.  Of course, in this case there are judicial admissions that FATCO employed the Individual Defendants after the stock acquisition.  These admissions are binding and cannot be contradicted.[59]

### 2. If the Court Is Not Going to Reconsider and Reverse, It Should Reconsider and Certify the *Joyner* Question to The Utah Supreme Court.

Pursuant to Rule 41 of the Utah Rules of Appellate Procedure this Court has discretion to certify a question of Utah law to the Utah Supreme Court "if the state of the law of Utah applicable to a proceeding before the certifying court is uncertain."  Utah R. App. P. 41(a).  Here, as the Court's order recognizes, there is no Utah case law on point and therefore the Court is not in a

---

[56]    847 So. 2d 406 (Fla. 2003).
[57]    Order at 21.
[58]    *See* Order at 21; *Corporate Exp. Office Products, Inc.*, 847 So. 2d at 407–408, 414–415 (rejecting "corporate culture and mode of operation" as a test for whether such a change in employment occurred because such a test was too vague and uncertain, but not rejecting the general principle that a restrictive provision can be triggered by a stock purchase if an employee is terminated and becomes an employee of the acquiring corporation).
[59]    *Roberts v. Roberts*, 2014 UT App 211, 335 P.3d 378; *Guidry v. Sheet Metal Workers Intern. Ass'n, Local No. 9*, 10 F.3d 700 (10th Cir. 1993) (quoting *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x 736 (10th Cir. 2013); *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, 243 P.3d 508, at Fn 5.

position to predict how the Utah Supreme Court would rule, consequently certification is appropriate.[60]

The Order acknowledges that *Joyner* is factually the most similar case to the instant case. The Court nevertheless rejected *Joyner* reasoning on the theory that the corporate law of Utah and Pennsylvania is divergent.  This is not true as shown *infra*.  Because of the importance of this question and because it is a matter of first impression, the Court should certify to the Utah Supreme Court the question of the following: "Whether in a stock acquisition the employment contracts of the target employees terminate if the acquirer becomes the employer without a transfer of the employment agreements to the acquirer."

## CONCLUSION

For the foregoing reasons, the Court should reconsider the Order and deny Plaintiffs' Motion for Partial Summary Judgment.  Alternatively, the Court should reconsider its Order and certify the controlling question of law to the Utah Supreme Court.

---

[60]      *Johnson v. Riddle*, No. 298-CV-599 TS, 2007 WL 1732400, at *1 (D. Utah June 14, 2007); *In re Reinhart*, 416 Fed. Appx. 761, 763 (10th Cir. 2011) (unpublished), *certified question answered,* 291 P.3d 228 (Utah 2012); *Tabor v. Metal Ware Corp.*, 182 Fed. Appx. 774, 775 (10th Cir. 2006) (unpublished), *certified question answered,* 168 P.3d 814 (Utah 2007).

DATED this 28th day of October, 2016.

WOOD BALMFORTH LLC


/s/ Mary Anne Q. Wood
Mary Anne Q. Wood
Stephen Q. Wood
60 East South Temple Street, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 366-6060
Facsimile: (801) 366-6061
mawood@woodbalmforth.com
swood@woodbalmforth.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2016, I filed with the clerk of court a true and correct copy of the foregoing **MOTION TO RECONSIDER OR TO RECONSIDER AND CERTIFY TO THE UTAH SUPREME COURT ORDER GRANTING IN PART AND DENYING IN PART FIRST AMERICAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT** via the CM/ECF System which sent notification to the following:

Mark O. Morris
Matthew L. Lalli
Amy F. Sorenson
Snell & Wilmer L.L.P.
15 W. South Temple, Suite 1200
Salt Lake City, UT  84101


/s/ Mary Anne Q. Wood