IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN TITLE COMPANY, LLC,<br><br>                Plaintiff,<br>v.<br><br>NORTHWEST TITLE INSURANCE AGENCY, LLC; MICHAEL SMITH; JEFF WILLIAMS; and KRISTI CARRELL,<br><br>                Defendants. | **MEMORANDUM DECISION AND ORDER MOOTING IN PART AND DENYING IN PART DEFENDANTS' [163] MOTION FOR SUMMARY JUDGMENT; GRANTING PARTIAL SUMMARY JUDGMENT UNDER RULE 56(f); BUT RESERVING RULING ON SOME ISSUES UNDER 56(f); AND DENYING DEFENDANTS' [309] MOTION TO RECONSIDER**<br><br>Case No. 2:15-cv-00229-DN<br><br>District Judge David Nuffer |

## BACKGROUND

### Parties

Plaintiffs First American Title Insurance Company and First American Title Company, LLC (collectively "First American") brought suit against Northwest Title Insurance Agency, LLC (Northwest) and Michael Smith, Jeff Williams, and Kristi Carrell (collectively "Individual Defendants").[1] The Individual Defendants are former employees of First American, and before that were employed by Equity Title Insurance Agency, Inc. ("Equity") which was absorbed by First American when the two merged. The Individual Defendants formed Northwest which competes with First American and employs dozens of other former First American employees.

---

[1] Complaint, docket no. 2, filed April 3, 2015.

**Claims**

The Complaint alleges 13 causes of action. The first three causes of action are for breach of contracts: Count I, against Michael Smith;[2] Count II, against Jeff Williams;[3] Count III, against Kristi Carrell.[4] Some of those contracts were entered into with First American and some were acquired by First American from Equity. Counts IV and V are, respectively, against Northwest and the Individual Defendants for tortious interference with contracts.[5] Count VI is against Smith for breach of fiduciary duty.[6] Counts VII–VIII are, respectively, against the Individual Defendants and Northwest for misappropriation of trade secrets.[7] Count IX is against the defendants for unfair competition.[8] Count X is against Northwest for tortious interference with economic relations.[9] Count XI is against the defendants for conspiracy.[10] Count XII is against the defendants for conversion.[11] Count XIII is against the Individual Defendants for violation of the Computer Fraud and Abuse Act.[12]

---

[2] *Id.* ¶¶ 126–32.

[3] *Id.* ¶¶ 133–39.

[4] *Id.* ¶¶ 140–46.

[5] *Id.* ¶¶ 147–68.

[6] *Id.* ¶¶ 169–75.

[7] *Id.* ¶¶ 176–91.

[8] *Id.* ¶¶ 192–99.

[9] *Id.* ¶¶ 200–06.

[10] *Id.* ¶¶ 207–12.

[11] *Id.* ¶¶ 213–17.

[12] *Id.* ¶¶ 218–23.

### Motion for Summary Judgment

In this motion,[13] the defendants "seek summary dismissal of all claims."[14] First American

opposed this motion.[15] The defendants replied to First American's opposition.[16]

Some issues relating to the first three causes of action were resolved by a previous

order.[17] That order held that:

> 1. The employment agreements executed with Equity survived First American's
> purchase of Equity stock and the First American-Equity merger, thus transferring
> the right to enforce those contracts to First American;
> 2. Smith and Williams breached the non-solicitation provisions of their
> employment agreements; and
> 3. Williams and Carrell breached the non-compete provisions of their
> employment agreements, and Smith did not.[18]

For the first three causes of action, the Order on the Motion for Partial Summary

Judgment left the following issues regarding the Equity employment agreements for this Motion:

> 1. First American's performance under the Employment Agreement;
> 2. the conscionability of the Equity employment agreements; and
> 3. damages.

### Motion to Reconsider

Defendants filed a motion to reconsider the Order on the Motion for Partial Summary

Judgment or reconsider and certify questions to the Utah Supreme Court.[19] First American

---

[13] Motion for Summary Judgment and Memorandum in Support (Motion), docket no. 163, filed April 19, 2016.

[14] *Id.* at xi.

[15] Plaintiff's Opposition to Motion for Summary Judgment (Opposition), docket no. 191, filed May 16, 2016.

[16] Reply Memorandum in Support of Motion for Summary Judgment (Reply), docket no. 225, filed June 30, 2016.

[17] Memorandum Decision and Order Granting in Part and Denying in Part First American's Motion for Partial Summary Judgment (Order on the Motion for Partial Summary Judgment), docket no. 302, entered October 18, 2016.

[18] *Id.* at 28.

[19] Motion to Reconsider or to Reconsider and Certify to the Utah Supreme Court Order Granting in Part and Denying in Part First American's Motion for Partial Summary Judgment (Motion to Reconsider), docket no. 309, filed October 28, 2016.

opposed the motion.[20] The defendants replied to First American's opposition.[21] Defendants'

motion to reconsider is denied.

## 56(f) Notice

After carefully reviewing the undisputed material facts, the parties were given notice that

pursuant to Rule 56(f) of the Federal Rules of Civil Procedure

> "the court may . . . grant summary judgment for the non-movant," plaintiffs, on
> the following:
> 1. Argument sections IV(C)(1)(b, c, and e) in the 163 Motion, relating to causes
> of action I–III;
> 2. The first three elements of a breach of contract claim (i.e. 1. existence of an
> enforceable contract; 2. performance by the party seeking recovery; and 3. breach
> of the contract by the other party) for the First American Employee Handbook
> and Code of Ethics and Conduct, relating to causes of action I–III;
> 3. Causes of action IV, V, and X: Defendants' tortious interference with contracts
> and economic relations; and
> 4. Cause of action XI: Civil Conspiracy.[22]

Both First American[23] and the defendants[24] provided additional briefing.

## Stipulated Dismissal

The parties stipulated to dismiss the following causes of action against the defendants:

Counts VII–VIII for misappropriation of trade secrets; Count IX for unfair competition; Count

---

[20] Plaintiffs' Response to Motion to Reconsider or to Certify to the Utah Supreme Court Order Granting in Part and Denying in Part First American's Motion for Partial Summary Judgment, docket no. 333, filed November 2, 2016.

[21] Reply Memorandum in Support of Motion to Reconsider or to Reconsider and Certify to the Utah Supreme Court Order Granting in Part and Denying in Part First American's Motion for Partial Summary Judgment, docket no. 334, filed November 4, 2016.

[22] Docket Text Order, docket no. 335, entered November 4, 2016.

[23] Plaintiffs' Response to Court's Notice Pursuant to Rule 56(f) (Plaintiffs' Rule 56(f) Response), docket no. 374, filed November 14, 2016.

[24] Response to Notice of Intent to Grant Summary Judgment on Court's Own Motion (Defendants' Rule 56(f) Response), docket no. 375, filed November 14, 2016.

XII for conversion; and Count XIII for violation of the Computer Fraud and Abuse Act.[25] An

order was entered dismissing those causes of action with prejudice.[26]

## Renewed Motion for Summary Judgment

After the order was entered dismissing those causes of action, the defendants filed a

Renewed Motion for Summary Judgment, and Motion for Expedited Briefing Schedule and

Consideration.[27] In that motion the defendants argue that, in light of the dismissal, tortious

interference with contracts and economic relations (Causes of Action IV, V, and X) and civil

conspiracy (Cause of Action XI) are no longer viable. An expedited briefing schedule was

ordered.[28] This order will not address those causes of action, and the undisputed facts related to

those claims will follow in a separate order.

## Summary of Order

In favor of First American, this order grants partial summary judgment under Rule 56(f):

- First American can, unless barred by equitable estoppel, enforce the Equity
  employment agreements.
  - First American did not materially breach the Individual Defendants'
    Equity employment agreements.
  - Enforceability of the Equity employment agreements is not barred by an
    increase in their geographic scope.
  - Duration, nature of interest, and the import of the Individual Defendants'
    positions do not render the non-competition provisions of the employment
    agreements unenforceable.
- The Confidential Information and Inventions Agreement is not void for
  unconscionability.
- The Employee Handbook and the Code of Ethics and Conduct are enforceable,
  unilateral contracts and are not illusory.

---

[25] Stipulated Motion to Dismiss Certain Claims Against Defendants, docket no. 383, filed November 18, 2016.

[26] Order on Stipulated Motion to Dismiss Certain Claims Against Defendants, docket no. 384, entered November 18,
2016.

[27] Docket no. 385, filed November 18, 2016.

[28] Docket Text Order, docket no. 386, entered November 18, 2016.

# Contents

Background ............................................................................................................... 1
    Parties 1
    Claims 2
    Motion for Summary Judgment ......................................................................... 3
    Motion to Reconsider ........................................................................................ 3
    56(f) Notice ....................................................................................................... 4
    Stipulated Dismissal .......................................................................................... 4
    Renewed Motion for Summary Judgment ......................................................... 5
    Summary of Order ............................................................................................. 5
    Contents ............................................................................................................ 6
Undisputed Material Facts ........................................................................................ 7
    1.     The Individual Defendants' relevant employment history. ..................... 7
         Mike Smith ..................................................................................... 7
         Jeff Williams ................................................................................. 10
         Kristi Carrell ................................................................................ 12
    2.     Employment at First American ........................................................... 14
    3.     Setting up Northwest Title ................................................................. 17
    4.     After opening Northwest ..................................................................... 23
Standard of Review ................................................................................................ 24
Discussion .............................................................................................................. 25
    The fact and amount of damages remains at issue ........................................... 25
Counts I–III: If First American is not Equitably Estopped, The Equity Employment Agreements
    Are Valid and Enforceable by First American; There are Issues of Material Fact for the
    Remaining Contracts. ...................................................................................... 26
    1.     The Equity Employment Agreements are valid contracts and First American
         fulfilled its obligations. ...................................................................... 26
         a.     The Order on the Motion for Partial Summary Judgment stands and no
             question will be certified to the Utah Supreme Court .................... 27
         b.     First American did not materially breach the Individual Defendants'
             employment agreements. ............................................................... 27
         c.     No impermissible expansion of geographic scope bars First American's
             enforcement of the employment agreements. ................................ 31
         d.     Duration, nature of interest, and Individual Defendants' positions do not
             render the non-competition provisions of the employment agreements
             unenforceable. ................................................................................ 33
    2.     First American may be equitably estopped from enforcing the Equity employment
         agreements. ......................................................................................... 37
    3.     Unconscionability does not bar enforcement of the CIIA. ................... 38
         a.     The CIIA may have some procedural unconscionability ................. 39
         b.     Substantively unconscionable aspects of the CIIA will not be enforced .. 42
    4.     The Employee Handbook and the Code of Ethics and Conduct are enforceable
         contracts but issues of fact relating to versions remain for the jury. ................... 45

Count VI: Smith may be liable for breaching his fiduciary duty to First American; questions of
        material fact Exist as to causation and damages. ........................................................... 51
    1.      Smith had a fiduciary relationship with First American. .................................... 51
    2.      Smith breached that duty. ................................................................................. 51
    3.      All elements remain for the jury. ...................................................................... 54
Conclusion ........................................................................................................................ 54
Order   54

**UNDISPUTED MATERIAL FACTS**[29]

**1.  The Individual Defendants' relevant employment history.**

**Mike Smith**

    1.      Mike Smith is an attorney who practiced real property law from 1987 through 1993. In 1993, he became General Counsel for Realty Title. Courtesy Title acquired Realty Title and Mike Smith became General Counsel for Courtesy Title. In 1995, Courtesy Title became Equity Title.[30]

    2.      In 2004, Mike Smith entered into the Employment Agreement between Equity Title Insurance Agency, Inc., and Michael M. Smith (Smith/Equity Agreement).[31]

    3.      Between 2003 and 2006, Equity had approximately 150 employees and between 18 and 20 offices throughout Utah.[32]

---

[29] This summary of the undisputed material facts is derived from the parties' memoranda. Edits have been made to remove disputed material. Those edits are not indicated in the summary. Many unnecessary factual and legal glosses were included in the facts sections in the briefing. Per Docket Text Order granting in part and denying in part 233 Motion to Strike, docket no. 301, entered October 18, 2016, "[a]ll unnecessary factual and legal glosses . . . will be disregarded."

[30] Motion ¶ 38 at xxi; Opposition at 2.

[31] Motion ¶ 39 at xxi; Opposition at 3.

[32] Opposition at 69; Reply App. B at 6; Declaration of Mark Webber ¶ 5, docket no. 192-3, filed May 17, 2016.

4.      In the Smith/Equity Agreement, Mike Smith agreed to be employed to serve as Chief Operating Officer and General Counsel of Equity. As COO of Equity, Mike Smith supervised all operations of Equity throughout Utah.[33]

5.      In September 2003, First American Title Insurance Company acquired a 25% ownership interest in Equity. First American Title Insurance Company acquired a further 25% ownership interest in Equity in March 2005. In December 2008, First American Title Insurance Company purchased an additional 45% ownership interest in Equity, making it the majority owner. First American Title Insurance Company acquired the remaining 5% ownership interest in Equity in February 2009, making it the sole owner.[34]

6.      On October 12, 2012, Equity merged with First American Title Company, LLC.[35]

7.      In May 2012, Smith refused to sign a new employment agreement with First American.[36]

8.      After First American acquired a majority interest in Equity in 2008, it began managing Equity's back office functions such as payroll, accounting, and title plant operations.[37]

9.      After 2011, Mike Smith was no longer Equity's General Counsel; he became State Underwriting and Legal Counsel.[38]

---

[33] Motion ¶ 40 at xxi; Opposition at 3.

[34] Motion ¶ 41 at xxi; Opposition at 3; Reply App. A at 10.

[35] Motion at xxii; Opposition at 6. In the Defendants' 56(f) Response, defendants discuss the difference between entities within the general First American corporate body. Defendants' 56(f) Response at 5–6. The reasoning in the Order on the Motion for Partial Summary Judgment at 17–22 applies.

[36] Motion ¶ 47 at xxii; Opposition at 6–7; Ninth Declaration of Michael Smith ¶ 11, docket no. 375-3, filed November 14, 2016.

[37] Motion ¶ 45 at xxii; Opposition at 5.

[38] Motion ¶ 49 at xxiii; Opposition at 7.

10.     As State Underwriting and Legal Counsel, Smith was to act as a lawyer for First American.[39]

11.     No one at First American complained to Smith about his legal work during the relevant time.[40]

12.     Under the Smith/Equity Agreement, Smith was entitled to a base salary with yearly cost of living adjustment (COLA) increases for those calendar years in which Equity earned a pre-tax net income of 5% or greater.[41]

13.     First American does not usually give salary increases that are designated as COLA increases.[42]

14.     Under the Smith/Equity Agreement, Smith was entitled to bonuses based on Equity's pre-tax net income.[43]

15.     Smith avers that "[i]n May 2012, Kurt Andrewsen [First American's former Regional Human Resources Manager], told [him] that Equity was gone, that [his] Equity contract no longer existed, and asked [him] to sign an employment agreement with [First American] that contained, among other things, restrictive covenants regarding non-competition, non-solicitation, in favor of [First American]."[44]

16.     Kurt Andrewsen denies having told Smith that his Equity contract no longer existed.[45]

---

[39] Opposition ¶ 238 at 78; Reply App. A at 233–34.

[40] Motion ¶ 241 at lxxvii; Opposition at 80.

[41] Motion ¶ 50 at xxiii; Employment Agreement between Equity Title Insurance Agency, Inc., and Michael M. Smith (Smith/Equity Agreement) ¶ 3(a), docket no. 164-13, filed April 21, 2016; Opposition at 8.

[42] Motion ¶ 51 at xxiii; Opposition at 8.

[43] Motion ¶ 52 at xxiii; Opposition at 8.

[44] Ninth Declaration of Michael Smith ¶ 11, docket no. 375-3, filed November 14, 2016.

[45] Motion ¶ 47 at xxii; Opposition at 6–7.

17.     Smith later signed the Utah Legal Counsel Production Bonus Plan, which "supersede[d] and replaced all previous production bonus plans, written or otherwise."[46]

18.     After signing the Utah Legal Counsel Production Bonus Plan, Smith received bonuses based on that plan.[47]

19.     On March 9, 2015, Smith resigned from First American.[48]

20.     Upon resigning, Smith took First American documents.[49]

21.     His assistant, Casey Buhler, helped him gather those documents.[50]

22.     When Smith resigned from First American, he left no project undone which had an imminent deadline, and First American had other lawyers who were also handling, or were capable of handling, regulatory matters.[51]

**Jeff Williams**

23.     Jeff Williams was hired by Courtesy Title—which later became Equity—as a runner and typist. In 1997, he became a licensed escrow officer. In 1999, he became Manager of Equity's West Jordan office.[52]

24.     On May 16, 2006, Williams entered into the Employment Agreement with Equity Title Insurance Agency, Inc. (Williams/Equity Agreement).[53]

---

[46] Motion ¶ 53 at xxiv; Opposition at 8–9.

[47] Motion ¶ 54 at xxiv; Opposition at 9.

[48] Motion ¶ 60 at xxv; Opposition at 11–12.

[49] Motion ¶ 242 at lxxvii–lxxviii; Opposition at 80.

[50] Opposition ¶ 243 at 80; Reply App. A at 236–37.

[51] Motion ¶ 245 at lxxviii; Opposition at 80.

[52] Motion ¶ 68 at xxviii; Opposition at 14.

[53] Motion ¶ 72 at xxix; Opposition at 15.

25.     In the Williams/Equity Agreement, Williams agreed to be employed as the "Senior Vice President of Escrow Operations of Equity."[54]

26.     Under First American's ownership, Williams's title was changed to Statewide Escrow Administrator.[55] He shared these responsibilities with another First American employee[56]

27.     Later, Williams's position changed again. He was appointed Northern Regional Manager.[57]

28.     Under the Williams/Equity Agreement, Williams was entitled to base salary with yearly COLA increases for those calendar years in which Equity earned a pre-tax net income of 5% or greater.[58]

29.     Under the Williams/Equity Agreement, Williams was entitled to bonuses consisting of 2.5 percent of "Equity's net profits."[59]

30.     Smith signed the Williams/Equity Agreement on behalf of Equity.[60]

31.     In 2012, Williams entered into a Director, Escrow Staff Development Production Bonus Plan.[61]

32.     The Production Bonus Plan states that it "supersedes and replaces all previous production bonus plans, written or otherwise."[62]

---

[54] Motion ¶ 76 at xxix; Opposition at 16.

[55] Motion ¶ 78 at xxix; Opposition at 17.

[56] Motion ¶ 78 at xxix; Opposition at 17.

[57] Motion ¶ 79 at xxx; Opposition at 17.

[58] Motion ¶ 80 at xxx; Opposition at 17–18.

[59] Motion ¶ 82 at xxx; Opposition at 18.

[60] Opposition ¶ 21 at 76; Reply App. B at 11.

[61] Motion ¶ 83 at xxx; Opposition at 18.

[62] Motion ¶ 83 at xxx; Opposition at 18.

33.     The Production Bonus Plan changed Williams's bonus compensation structure.[63]

34.     Williams voluntarily terminated his employment with First American on March 10, 2015, without providing 30-days' notice.[64]

**Kristi Carrell**

35.     Kristi Carrell began working for Equity in 1998 as an Escrow Assistant. She obtained her escrow license in 1999 and became an Escrow Officer. In 2003, she became the Manager of Equity's West Jordan office, and was made a Vice President of Equity.[65]

36.     In 2003, Carrell entered into a letter agreement regarding her employment, (Carrell/Equity Agreement).[66]

37.     The Carrell/Equity Agreement provides for Carrell's employment as "Vice President/Manager of the West Jordan Office."[67]

38.     In 2004, Equity moved Carrell to the Sugar House office, where she continued to function as a Vice President of Equity and where she became the Manager of the Sugar House office.[68] But Equity did not enter into a new agreement with Carrell.[69]

39.     In the Carrell/Equity Agreement, Carrell agreed to be employed as the Vice President/Manager of the West Jordan office of Equity.[70]

---

[63] Motion ¶ 84 at xxx–xxxi; Opposition at 19.

[64] Motion ¶ 90 at xxxii; Opposition at 21.

[65] Motion ¶ 99 at xxxv; Opposition at 23.

[66] Motion ¶ 100 at xxxv; Opposition at 23.

[67] Motion ¶ 101 at xxxv; Opposition at 23.

[68] Motion ¶ 102 at xxxv; Opposition at 23.

[69] Motion ¶ 102 at xxxv; Opposition at 23.

[70] Motion ¶ 107 at xxxvi; Opposition at 24.

40.     Under the Carrell/Equity Agreement, Carrell was entitled to a bonus of 15 percent of the net income of her office.[71]

41.     Carrell avers the following: "In late 2012, Cherry Dornbier, a [First American] manager, came to my office in Sugarhouse to speak to me about the necessity of signing a new bonus plan with [First American] effective January 1, 2012. At that time, she told me that Equity was gone, and that any former Equity contracts no longer existed."[72]

42.     In 2012, Carrell entered into an Escrow Branch Manager Production Bonus Plan.[73] This plan "supersedes and replaces" all prior bonus plans whether "written or otherwise."[74]

43.     Carrell's bonuses were determined according to the terms of the Production Bonus Plan.[75]

44.     Aspects of Carrell's job changed, including the authority to make hiring, firing, and compensation decisions and to make vendor decisions.[76]

45.     When Carrell resigned from First American on March 10, 2015, she was an escrow officer who managed the Sugar House office, one of First American's most successful and profitable branches.[77]

---

[71] Motion ¶ 110 at xxxvi; Opposition at 25.

[72] Seventh Declaration of Kristi Carrell ¶ 11, docket no. 375-1, filed November 14, 2016. Because Carrell had never before made this averment on the record until the defendants filed the Defendants' 56(f) Response, First American has not been able to respond to Carrell's claim.

[73] Motion ¶ 111 at xxxvi; Opposition at 25–26.

[74] Motion ¶ 111 at xxxvi; Opposition at 25–26.

[75] Motion ¶ 112 at xxxvii; Opposition at 26.

[76] Motion ¶ 115 at xxxvii; Opposition at 27.

[77] Motion ¶ 120 at xxxviii; Opposition at 28.

46.    Carrell was very good at her job and had formed many important relationships with customers.[78]

## 2. Employment at First American

47.    By the time Equity offices were rebranded as First American offices at the end of 2011, Equity had only seven offices, located in Draper, Union Heights, Sugar House, West Jordan, Orem, South Ogden, and St. George.[79]

48.    First American was and is the second largest title company in North America, with an unknown number of offices in all 50 states and in 60 countries.[80] In Utah, at the end of 2011, First American had at least 23 offices, located in Union Heights, Orem, South Ogden, Downtown Salt Lake City, Foothill Drive in Salt Lake City, American Fork, Bountiful, two in Union Park, Delta, Ephraim, Fillmore, Heber City, Layton, two in Park City, Richfield, South Jordan, St. George, and Cedar City.[81]

49.    First American had over 17,000 employees in its offices throughout the United States and in 60 countries. In Utah—assuming that each First American office had four or five employees—First American had at least 100 employees.[82]

50.    Utah has approximately 1,300 licensed escrow agents.[83]

51.    Utah has licensed 159 separate title and escrow companies. Many of these have multiple branch offices.[84]

---

[78] Motion ¶ 123 at xxxix; Opposition at 29.

[79] Motion ¶ 61 at xxv; Opposition at 12.

[80] Motion ¶ 62 at xxvi; Opposition at 12.

[81] Motion ¶ 62 at xxvi; Opposition at 12.

[82] Motion ¶ 65 at xxvi; Opposition at 13.

[83] Motion ¶ 121 at xxxix; Opposition at 28.

[84] Motion ¶ 122 at xxxix; Opposition at 28–29.

52.     First American employees are frequently required to look at online e-training, consisting of presentations and documents that employees are required to acknowledge online.[85]

53.     Among the documents which First American employees must open and acknowledge are the First American Employee Handbook, the Code of Ethics and Conduct, and the Confidential Information and Inventions Agreement (CIIA).[86]

54.     The First American Employee Handbook[87] sets forth employee privileges and obligations, provides complaint protocol, and outlines consequences for failure to comply with the handbook, specifically discipline and termination.[88]

55.     When accessing the Employee Handbook employees receive a prompt that, at the end of a description of the privileges and obligations associated with the handbook, states, "By clicking 'I Acknowledge,' I confirm that I have read and agree to the terms noted above."[89]

56.     First American reserves the right to change any of the terms of the Employee Handbook at any time, without notice. When the Employee Handbook is revised employees are asked to review and agree to its terms again.[90]

57.     The acknowledgement of the Code of Ethics and Conduct[91] states that the employee has "read and understood the Code's contents" and that employees "are expected to know and abide by the [its] rules of ethical conduct."[92]

---

[85] Motion ¶ 126 at xlii; Opposition at 30.

[86] Motion ¶ 129 at xliii; Opposition at 31.

[87] The First American Way ("Employee Handbook" or "Handbook"), docket no. 164-20, filed April 21, 2016.

[88] Motion ¶ 130 at xliii; Opposition at 31.

[89] Declaration of Elaine Basler and Exhibits thereto ¶ 11 at 6–7, docket no. 164-29, filed April 21, 2016.

[90] Motion ¶ 132 at xliii; Opposition at 32; Reply App. A at 100–101.

[91] Code of Ethics and Conduct (CIIA), docket no. 103-13, filed January 29, 2016.

[92] Declaration of Elaine Basler and Exhibits thereto ¶ 10 at 5–6, docket no. 164-29, filed April 21, 2016.

58.     The acknowledgement of the CIIA[93] states "I acknowledge that I have read and that I understand all provisions of this agreement, a copy of which has been delivered to me. By signing below, I agree to be bound by all its terms."[94]

59.     Before accessing the CIIA, the employees are prompted to "contact [their] local division human resources representative or Corporate Human Resources at" a specific email address if they had any questions.[95]

60.     Employees were given time to read the CIIA before agreeing to its terms.[96]

61.     The CIIA is four pages long.[97]

62.     Those former First American employees who were deposed did not recall seeing or agreeing to the CIIA.[98]

63.     First American's records show that they did.[99]

64.     While the Individual Defendants claim they do not recall signing the CIIA, none deny that they did sign it.[100]

65.     None of the Individual Defendants denies acknowledging the First American Handbook and Code of Ethics.[101]

---

[93] Confidential Information and Inventions Agreement (CIIA), docket no. 164-30, filed April 21, 2016.

[94] Opposition ¶ 134 at 32–33; Reply App. A at 103.

[95] Declaration of Elaine Basler ¶ 12 at 8, docket no. 164-29, April 21, 2016.

[96] Opposition at 33–34; Reply App. A at 105–106.

[97] CIIA.

[98] Motion ¶ 148 at xlvii–l; Opposition at 38–41.

[99] Declaration of Elaine Basler and Exhibits thereto ¶ 16 at 11–12.

[100] Opposition ¶ 5 at 68; Reply App. B at 3–5.

[101] Opposition ¶ 6 at 68; Reply App. B at 3–5.

66.     First American's record shows that the designation under the "Completion Status" column for the Handbook and the Code of Ethics varies among the Individual Defendants.[102]

67.     First American's record also shows that the Individual Defendants last viewed different versions of the Employee Handbook and Code of Ethics than the one attached to the Complaint.[103]

68.     First American's analyst for learning and professional development at First American states:

> In addition to capturing the initial instance an employee acknowledges an agreement or completes a training, KnowledgeSPOT captures every instance in which an employee updates his acknowledgement to an agreement or completes an updated or revised training. So long as an employee completes what he has begun on KnowledgeSPOT, KnowledgeSPOT records every instance an employee logs in to the system.[104]

69.     All the employment contracts between the Individual Defendants and First American were at-will contracts.[105]

### 3. Setting up Northwest Title

70.     Discussions about forming Northwest Title began nearly two years ago. Casey Willoughby was working as the Branch Manager of First American's Orem office and an Escrow Officer. He contemplated leaving First American, and talked to Doug Smith about it at family events. Doug Smith—an attorney whose wife is a first cousin of Willoughby's wife—suggested that Willoughby start his own title business.[106]

---

[102] Exhibit G to Declaration of Elaine Basler, docket no. 164-29, filed April 21, 2016.

[103] *Id.*

[104] Declaration of Elaine Basler ¶ 6, docket no. 192-6, filed May 17, 2016.

[105] Motion ¶ 222 at lxix; Opposition at 74.

[106] Opposition ¶ 58 at 106; Reply App. B at 25–29.

71.     Doug Smith is not related to the defendant Mike Smith.[107]

72.     Doug Smith and Clark Olsen had no experience in the title and escrow industry. Nor did Willoughby have the knowledge and experience necessary to manage the operations of a title company. To move forward, they knew they would need to involve someone with experience running a title business.[108]

73.     Willoughby arranged a meeting to introduce Doug Smith and Clark Olsen to his colleague at First American, Mike Smith. The first meeting occurred in early spring of 2014. Prior to that meeting, Mike Smith had never met Doug Smith or Clark Olsen.[109]

74.     At the meeting, the four men discussed the possibility of opening a title business. The idea was that Olsen would contribute capital and Mike Smith would run the company. Mike Smith expressed his interest in the proposed venture and agreed to consider it further.[110]

75.     Several months later, Willoughby called Doug Smith to inform him that Mike Smith was interested in rekindling the discussions. At that point, having made the necessary introductions and expressed his desire to move forward, Willoughby left the details to the others.[111]

76.     A second meeting between Mike Smith, Doug Smith, and Clark Olsen took place in November or December of 2014. They met to discuss further the possibility of opening a title business. Specifically, Doug Smith testified:

Q: Okay. And what did you discuss in that regard?

---

[107] Motion ¶ 1 at xi.

[108] Opposition ¶ 59 at 106; Reply App. B at 25–29.

[109] Opposition ¶ 60 at 106; Reply App. B at 25–29.

[110] Opposition ¶ 61at 107; Reply App. B at 25–29.

[111] Opposition ¶ 62 at 107; Reply App. B at 25–29.

A: Primarily that day-to-day operations would be run by Mike, and Clark would contribute capital to the venture.[112]

77.     They also discussed who the owners of the business would be, including Doug Smith, Clark Olsen, Mike Smith, Casey Willoughby, and Jeff Williams—the latter three were all employees of First American.[113]

78.     Ownership of Northwest is divided up as follows: Clark Olsen, 51 percent; Mike Smith, 29 percent; Doug Smith, 10 percent; Jeff Williams, five percent; and Casey Willoughby, five percent.[114]

79.     Around the same time, in October or November of 2014, Mike Smith began communicating with Mike Koloski of Westcor Land Title Insurance Company (Westcor). Westcor is a national title insurance underwriter that competes with First American.[115]

80.     Smith informed Koloski that he was interested in starting his own title company. He told Koloski that the name of the company would be Northwest Title, and they began working to formalize a relationship so that Northwest Title could become a title insurance issuing agent for Westcor.[116]

81.     Mike Smith, Doug Smith, and Clark Olsen met for a third time in January 2015. At that meeting, they discussed the terms of an operating agreement and the ownership percentages that each owner of Northwest Title would have.[117]

---

[112] Opposition ¶ 63 at 107; Reply App. B at 26–29.

[113] Opposition ¶ 64 at 107; Reply App. B at 26–29.

[114] Excerpts from Deposition of Douglas C. Smith at 115–16, docket no. 164-2, filed April 21, 2016..

[115] Opposition ¶ 65 at 107; Reply App. B at 26–29.

[116] Opposition ¶ 66 at 108; Reply App. B at 26–29.

[117] Opposition ¶ 67 at 108; Reply App. B at 26–29.

82.     Later in January 2015, Mike Smith arranged a meeting to introduce Jeff Williams and Casey Buhler, his long-time administrative assistant at First American, to Doug Smith.[118]

83.     During that meeting, Doug Smith presented Williams with a draft operating agreement and they discussed Williams' ownership percentage in Northwest Title. The participants also discussed things they were working on and tasks they had been assigned to move forward with creating Northwest Title.[119]

84.     Meanwhile, Jeff Williams was working with a contact he had to establish an underwriting relationship between Northwest Title and another competitor of First American, Stewart Title Guaranty Company (Stewart Title).[120]

85.     On January 17, 2015, Mike Smith signed a Regional Agency Application on behalf of Northwest Title and submitted it to Westcor. He identified himself as the "President/Manager" of Northwest Title and the "Primary Application Contact."[121]

86.     Mike Smith listed himself, Jeff Williams, Casey Willoughby, and Casey Buhler as employees of Northwest Title. This was almost two months before any of them left First American.[122]

87.     Around the same time, Doug Smith filed a Certificate of Organization on behalf of Northwest Title with the Utah Department of Commerce.[123]

---

[118] Opposition ¶ 68 at 108; Reply App. B at 26–29.

[119] Opposition ¶ 69 at 108; Reply App. B at 26–29.

[120] Opposition ¶ 75 at 109; Reply App. B at 27–29.

[121] Opposition ¶ 76 at 109; Reply App. B at 27–29.

[122] Opposition ¶ 77 at 109; Reply App. B at 27–29.

[123] Opposition ¶ 78 at 109; Reply App. B at 27–29.

88.     The registration was approved and the company was certified to do business on January 26, 2015.[124]

89.     Under Article II of the certificate, Northwest Title was formed for the purpose of providing "Ti[t]le and settlement services"—the same services that First American provides.[125]

90.     The efforts to open Northwest Title continued in February of 2015. By February 4, 2015, Northwest Title already had signed a lease for its Corporate/Sugar House office. Mike Smith negotiated the lease. Doug Smith signed it.[126]

91.     The location of that office is in the building next door to First American's Sugar House office.[127]

92.     On February 28, 2015, Mike Smith wrote to Mike Koloski:

We are doing well. Our title guy starts tomorrow, so we have at least that in place. Actually, we have a lot in place. Our main office space is ready to go. I am still working on a critical issue on the space we are trying to tie down in Union Heights . . . I am not yet ready to leave that group behind without getting them in the barn.[128]

93.     Northwest Title applied for its title escrow and title search licenses on February 7, 2015.[129]

94.     The application was approved by the Utah Insurance Department and the licenses were issued on February 18, 2015.[130]

---

[124] Opposition ¶ 79 at 109; Reply App. B at 27–29.

[125] Opposition ¶ 80 at 109; Reply App. B at 27–29.

[126] Opposition ¶ 81 at 110; Reply App. B at 27–29.

[127] Opposition ¶ 82 at 110; Reply App. B at 28–29.

[128] Opposition ¶ 31 at 98–99; Reply App. B at 16–17.

[129] Opposition ¶ 83 at 110; Reply App. B at 28–29.

[130] Opposition ¶ 84 at 110; Reply App. B at 28–29.

95.     As a result, Northwest Title could formalize its relationship with Westcor. The same day, those companies executed an Issuing Agency Agreement, which was signed by Mike Smith on behalf of Northwest Title.[131]

96.     Mike Smith appointed himself as a licensed title agent for Northwest Title on February 18, 2015—three weeks before he left First American.[132]

97.     In an e-mail to Mike Smith the same day, Mike Koloski exclaimed: "We have a new agent in Utah . . . Northwest Title . . . Mike Smith, President."[133]

98.     When Koloski asked when Westcor should report the new agency relationship to the state, Smith responded: "Please wait a few days to appoint us if there is a chance someone will see it." He made that request because he did not want First American to discover that he was involved with Northwest.[134]

99.     Williams was responsible for opening Northwest Title's bank accounts.[135]

100.    He opened an operating account and a payroll account at Zions Bank in February 2015.[136]

101.    Like Mike Smith, Jeff Williams attempted to conceal his activities by using his wife's personal e-mail account to communicate about Northwest Title business.[137]

102.    On March 3, 2015, Jeff Williams prepared the Schedule of Minimum Charges for Escrow Services that Northwest Title needed to file with the Utah Department of Insurance. He

---

[131] Opposition ¶ 85 at 110; Reply App. B at 28–29.

[132] Opposition ¶ 86 at 110; Reply App. B at 28–29.

[133] Opposition ¶ 87 at 110; Reply App. B at 28–29.

[134] Opposition ¶ 88 at 110; Reply App. B at 28–29.

[135] Opposition ¶ 89 at 110; Reply App. B at 28–29.

[136] Opposition ¶ 90 at 111; Reply App. B at 28–29.

[137] Opposition ¶ 92 at 111; Reply App. B at 28–29.

used his First American computer to complete the form, then e-mailed it to his wife's personal account so another employee of Northwest Title could file it.[138]

### 4. After opening Northwest

103.    Besides Smith, Williams, and Carrell, twenty-five other First American employees left First American to join Northwest at its inception.[139]

104.    Between March 10, 2015, and March 24, 2015, Northwest Title hired twenty-eight employees from First American.[140]

105.    Immediately after joining Northwest Title, the former First American employees began contacting First American's customers exclaiming, for example, that the "whole office switched companies"; "[t]he whole office went ;-)"; or "we've all switched title companies" and "are located in the bldg. next to where we were with First American."[141]

106.    Geraldine Jensen promised: "New name same great customer service."[142]

107.    Others, like Elizabeth Cole, added that "[w]e are transferring everything over here" and "I still plan to close your deal (we have all of the info)." When one customer asked Cole what happened, she responded that "Mike Smith left FATCO and started his own company" and "[m]ost people followed."[143]

---

[138] Opposition ¶ 93 at 111; Reply App. B at 28–29.

[139] Order on the Motion for Partial Summary Judgment ¶ 58 at 11.

[140] Order on the Motion for Partial Summary Judgment ¶ 59 at 11.

[141] Opposition at 103; Reply App. B at 20–22.

[142] Opposition at 103; Reply App. B at 20–22.

[143] Opposition at 103; Reply App. B at 20–22.

108.    As a result, less than three weeks after opening its doors, Northwest already had "600 orders" with Westcor. Mike Koloski characterized getting that many customers in such a short period of time as "getting slammed."[144]

109.    Northwest Title profited from at least 150 transactions that were opened at First American but later closed at Northwest.[145]

110.    Nearly every Northwest Title employee deposed testified that a majority of his or her customers at Northwest Title were his or her customers from First American.[146]

111.    One Northwest Title Sales Manager, Diane Mouser, recently bragged on Facebook that 95% of First American's former Sugar House customers left for Northwest Title.[147]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[148] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[149] In determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[150]

---

[144] Opposition at 104; Reply App. B at 20–22.

[145] Opposition at 104; Reply App. B at 22.

[146] Opposition at 104; Reply App. B at 22–23.

[147] Opposition at 104; Reply App. B at 22–23.

[148] Fed. R. Civ. P. 56(a).

[149] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[150] *Id.*

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[151]

> If the court moves on to entertain the prospect of entering summary judgment against the unsuccessful movant, whether in response to a cross-motion for summary judgment or on its own initiative, then the court must be mindful of its obligation to adopt . . . a dual, "Janus-like" perspective. That is, the court must now grant the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent. Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant.[152]

## DISCUSSION

**The fact and amount of damages remains at issue**

The remaining causes of action require proof of damages. To prove damages for each cause of action, First American refers to the report by its damages expert.[153] Northwest argues this is too vague[154] and that First American must provide a separate damages figure for each cause of action and each defendant.[155]

To prove damages, First American must prove two points.

> First, it must prove the fact of damages. The evidence must do more than merely give rise to speculation that damages in fact occurred; it must give rise to a reasonable probability that the plaintiff suffered damage as result of a breach. Second, the plaintiff must prove the amount of damages. The level of persuasiveness required to establish the *fact* of loss is generally higher than that required to establish the *amount* of a loss.[156]

---

[151] *Id.* at 670–71.

[152] *Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

[153] *See, e.g.*, Opposition at 144.

[154] *See, e.g.*, Reply at 29.

[155] *Id.*

[156] *Atkin Wright & Miles v. Mountain States Telephone and telegraph Co.*, 709 P.2d 330, 336 (Utah 1985).

"While the standard for determining the amount of damages is not so exacting as the standard for proving the fact of damages, there still must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages."[157]

While the jury will be required to find damages on each claim against each named defendant, the expert report raises damage fact issues. Moreover, the expert's report aside, First American "might be able to prove [other damages] in other ways."[158] Therefore, the question of damages, both fact and amount, is left to the jury.

### COUNTS I–III: IF FIRST AMERICAN IS NOT EQUITABLY ESTOPPED, THE EQUITY EMPLOYMENT AGREEMENTS ARE VALID AND ENFORCEABLE BY FIRST AMERICAN; THERE ARE ISSUES OF MATERIAL FACT FOR THE REMAINING CONTRACTS.

In Counts I–III,[159] First American alleges that the Individual Defendants breached the Equity Employment contracts, CIIA, Employee Handbook, and Code of Ethics and Conduct.[160] "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[161]

### 1. The Equity Employment Agreements are valid contracts and First American fulfilled its obligations.

As detailed below and in the Order on the Motion for Partial Summary Judgment,[162] the first three elements of the breach of contract claims are no longer at issue for the Equity employment agreements. Unless equitably estopped from enforcing them, First American can

---

[157] *Id.*

[158] *Trugreen Companies, L.L.C. v. Scotts Lawn Service*, 508 F. Supp. 2d 937, 962 (D. Utah 2007).

[159] Complaint ¶¶ 126–46.

[160] Though the Complaint does not mention the Code of Ethics and Conduct by name, it is incorporated by reference in the Employee Handbook. *See* The First American Way ("FATCO Employee Handbook") at 4-2, docket no. 164-20, filed April 21, 2016.

[161] *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

[162] Order on the Motion for Partial Summary Judgment at 13–16.

enforce those agreements. This order resolves some issues of the breach of contract claims for the remaining employment contracts (i.e. the CIIA, Employee Handbook, and the Code of Ethics and Conduct) but there are many questions of fact that the jury must determine.

### a. The Order on the Motion for Partial Summary Judgment stands and no question will be certified to the Utah Supreme Court.

The order on the [217] Motion for Partial Summary Judgment resolved the following issues:

> 1. The Individual Defendants' employment agreements survived the stock purchase and the merger, thus transferring the right to enforce those contracts to First American;
> 2. Smith and Williams breached the non-solicitation provisions of their employment agreements; and
> 3. Williams and Carrell breached the non-compete provisions of their employment agreements, and Smith did not.[163]

The defendants filed a motion to reconsider the order on the [217] Motion for Partial Summary Judgment or to reconsider and certify a question to the Utah Supreme Court. The defendants argue that the order causes "manifest injustice."[164]

After carefully considering the defendants' arguments, the order and its reasoning stands. No question will be certified to the Utah Supreme Court. The motion to reconsider is denied.

### b. First American did not materially breach the Individual Defendants' employment agreements.

The second element of a breach of contract claim is "performance by the party seeking recovery."[165] The defendants argue that First American has not fulfilled its performance

---

[163] Accordingly, the following sections of the Motion's argument are now moot in their entirety: C(1)(a) and C(1)(d). As discussed in greater detail below, other sections are now partially moot.

[164] Motion to Reconsider at 2.

[165] *Bair*, 20 P.3d at 392.

obligations because it changed the Individual Defendants' employment positions, authority, and duties.[166]

      "It is well-settled law that one party's breach excuses further performance by the non-breaching party if the breach is material."[167] A party causes a material breach when it breaches the material terms. "Essential or material terms in a contract involving an employment relationship include, duration, compensation and the employee's duties."[168] For at-will employment contracts, the duration of employment is not a material term. Further, in the at-will setting, the employer can unilaterally change compensation and the employee's duties.[169] If the employee continues employment after those changes, the newly changed terms become part of their employment contract.[170]

      It is undisputed that the Individual Defendants' employment agreements were at-will contracts.[171] Thus, only changes in compensation and duties and whether those changes constitute a material breach will be considered.

      The relevant provisions in Smith's contract states:

      In his capacity as Chief Operating Officer, Smith shall do and perform all
      services, acts, or things necessary or advisable to assist in the management of the

---

[166] Motion at 6–9.

[167] *McArthur v. State Farm Mut. Auto. Ins. Co.*, 274 P.3d 981, 987 (Utah 2012) (quoting *Orlob v. Wasatch Med. Mgmt.*, 124 P.3d 269, 275 (Utah Ct. App. 2005).

[168] *Adair v. Pfizer, Inc.*, 245 F.Supp.2d 437, 441 (D. Conn. 2003).

[169] *Ryan v. Dan's Food Stores Inc.*, 972 P.2d 395, 401 (Utah 1998) (quoting *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991)) ("In the case of unilateral contract for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer."); *Whisman v. Ford Motor Co.*, 157 Fed.Appx. 792, 800–01 (6th Cir. 2005) (quoting approvingly the lower court's reasoning) ("It stands to reason that an employer who may legally terminate an employee on any given day without reason may also take the lesser step of altering the terms and conditions of the employee's employment prospectively without incurring liability for breach of contract or promissory estoppel.").

[170] *Ryan*, 972 P.2d at 401.

[171] Undisputed Material Facts ¶ 69.

business of Equity, subject always to the policies set by the President and the
Board of Directors. In addition to the foregoing, Smith shall perform such other
duties as may be assigned by the President or the Board of Directors from time to
time.[172]

The relevant provisions in Williams's contract similarly states:

In his capacity as Senior Vice President, Williams shall do and perform all
services, acts, or things necessary or advisable to assist in the management of the
business of Equity, subject always to the policies set by the President and the
Board of Directors. In addition to the foregoing, Williams shall perform such
other duties as may be assigned by the President or the Board of Directors from
time to time.[173]

Carrell's contract does not contain a provision delineating her duties. It does, however,

state that she is the "Vice President/Manager of the West Jordan office of Equity Title Insurance

Agency, Inc."[174] Though the extent of the changes to their compensation and duties that occurred

after First American became the sole shareholder of Equity may be in dispute, the fact of

changes occurring is not in dispute.[175] Sometime after 2008, Smith was no longer COO,[176]

Williams was no longer Senior Vice President,[177] and Carrell was no longer Vice

President/Manager of the West Jordan office.[178] Their compensation also changed.[179]

The question of materiality does not need to be fully addressed. By continuing their

employment with Equity and First American, the Individual Defendants accepted any change to

their contract, which made those changes part of their contracts: "the new or changed conditions

---

[172] Smith/Equity Agreement ¶ 2.

[173] Williams/Equity Agreement ¶ 2.

[174] Carrell/Equity Agreement ¶

[175] Undisputed Material Facts ¶¶ 9, 26–27, and 44–45.

[176] *Id.* ¶ 9.

[177] *Id.* ¶ 26.

[178] *Id.* ¶ 38.

[179] *Id.* ¶¶ 18, 33, and 43.

may become a contractual obligation."[180] They continued performance under those contracts for over two years.[181]

Furthermore, Smith's and Williams's contractual obligations were indisputably broad: They "shall do and perform all services, acts, or things necessary or advisable to assist in the management of the business of Equity, subject always to the policies set by the President and the Board of Directors. In addition to the foregoing, [Smith/Williams] shall perform such other duties as may be assigned by the President or the Board of Directors from time to time."[182] And the Carrell/Equity Agreement does not even mention the parameters of her duties. With provisions as broad as these, the argument that the Individual Defendants were working in capacities not captured by these provisions rings hollow. The primary issue seems to be the Individual Defendants' change in titles. But there is no convincing authority stating that a person's title is a material term as a matter of law.[183] And the Individual Defendants' declarations to the contrary[184] have no effect.

Additionally, searching through the various papers, it appears the defendants never overcome *Ryan v. Dan's Food*, *Johnson v. Morton Thiokol, Inc.*,[185] or *Trembly v. Mrs. Fields*

---

[180] *Ryan*, 972 P.2d at 401.

[181] Undisputed Material Facts ¶¶ 6, 19, 34, and 45.

[182] Smith/Equity Agreement ¶ 2.

[183] *See, e.g.*, Motion at 7 n.462.

[184] Seventh Declaration of Kristi Carrell ¶ 5, docket no. 375-1, filed November 14, 2016 ("My position as Vice President/Manager of the West Jordan office was a material term to my agreement with Equity"); Eighth Declaration of Jeffrey Williams ¶ 5, docket no. 375-2, filed November 14, 2016 ("My position as Vice President of Escrow Operations of Equity was a material term to my agreement with Equity"); Ninth Declaration of Michael Smith ¶ 5, docket no. 375-3, filed November 14, 2016 ("My position as COO and General Counsel of Equity was a material term to my Agreement with Equity"). A declaration that expresses legal opinions does not create a factual dispute. *See Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983) ("To raise a genuine issue of fact, an affidavit must do more than reflect the affiant's opinions and conclusions.").

[185] 818 P.2d at 1002. Defendants do cite this case in passing (Reply at 14), but in the context of whether employee handbooks can impose binding obligations on the employee.

*Cookies*.[186] As quoted above,[187] these Utah cases hold, that "where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract."[188] Instead of addressing these cases, the defendants cite mostly holdings from non-Utah courts.[189] One case the defendants rely upon extensively is *Lantor Inc. v. Ellis*,[190] which seems to directly contradict the holdings in these Utah cases.

In summary, the combination of broad contractual obligations and the Individual Defendants' continuing employment with Equity and First American after their duties were changed defeats their argument that First American breached the Equity employment agreements.

### c.   No impermissible expansion of geographic scope bars First American's enforcement of the employment agreements.

The Order on the Motion for Partial Summary Judgment found that First American can enforce the Equity employment agreements as Equity's successor.[191] This section addresses defendants' argument that First American cannot simply step into the shoes of Equity because that would greatly expand the geographic scope of the non-compete and non-solicitation agreements.[192]

---

[186] 884 P.2d 1306 (Utah Ct. App. 1994).

[187] *Supra* n.169.

[188] *Ryan*, 972 P.2d at 401 (quoting *Johnson*, 818 P.2d at 1002).

[189] Defendants' Rule 56(f) Response at 5–11 (citing the authority contained in the Motion and some new authority).

[190] No. CIV.A. 98-01064, 1998 WL 726502 (Mass. Super. Oct. 2, 1998). Though it is not clear if there is a contradiction. *Lantor*'s facts and contractual details are too distinct to make a good comparison.

[191] Order on the Motion for Partial Summary Judgment at 28.

[192] Motion at 10–14.

Under Utah law, non-compete provisions are construed narrowly.[193] Utah courts avoid deciding whether a non-compete agreement is overly broad in its entirety.[194] Instead, a court will consider whether a non-compete provision is too broad as applied to the acts specified in the complaint.[195] Defendants argue that substituting First American in place of Equity would "dramatically increase" the geographic area in which they could not compete and the number of employees they could not solicit.[196] However, First American's complaint against the Individual Defendants only brings suit on activities that would have violated the non-compete and non-solicitation provisions even if limited to the employees and geographic location implicated before Equity merged with First American.

The geographic extent of a non-competition agreement is permissible "if it specifies an area no greater than that to which the business extends, and it is unenforceable if it specifies a territory broader than encompassed by the . . . business . . . . The fact that the covenant covers the entire State of Utah does not render the covenant per se unreasonable."[197] Williams's covenants cover "an area in all directions 100 miles from any of the offices of Equity."[198] Carrell's covenant prohibits competing with any "title insurance or escrow business within a 40-mile radius of any of Equity Title's offices."[199] Given the number of Equity offices throughout Utah

---

[193] *Bad Ass Coffee Co. of Hawaii v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1246–47 (D. Utah 2009).

[194] *Id.* at 1247.

[195] *J & K Computer Sys., Inc. v. Parrish*, 642 P.2d 732, 736 (Utah 1982).

[196] Motion at 11.

[197] *Electrical Distributors Inc. v. SFR Inc.*, 166 F.3d 1074, 1085 (10th Cir. 1999).

[198] Williams/Equity Agreement ¶ 7.

[199] Carrell/Equity Agreement ¶ 7.

when the Individual Defendants signed the Equity agreements[200] and around the time of the merger,[201] this area is not unreasonable.

Defendants also cite *Ted R. Brown and Associates, Inc. v. Carnes Corp.*[202] for the proposition that "a court may not make a better contract for the parties than they have made for themselves."[203] The defendants argue that if the Equity agreement is read to only encompass Utah offices, that would effectively rewrite the contracts, thus "salvaging them for" First American.[204] But this analysis reads the contracts as written, with geographic limitation based on the former Equity offices.

### d. Duration, nature of interest, and Individual Defendants' positions do not render the non-competition provisions of the employment agreements unenforceable.

The defendants argue that though the non-compete agreements may have been valid for Smith and Williams when signed, they became invalid over time because Smith and Williams were demoted and no longer held key positions.[205] Carrell argues that her non-compete was never valid because she was never in a key position.[206]

For a covenant not to compete to be valid in Utah it must be "carefully drawn to protect only the legitimate interests of the employer."[207] Utah courts will only enforce restrictive covenants "where they are necessary for the protection of the business for the benefit of which the covenant was made and no greater restraint is imposed than is reasonably necessary to secure

---

[200] Undisputed Material Facts ¶ 3.

[201] *Id.* ¶ 47.

[202] 753 P.2d 964 (1988).

[203] *Id.* at 970.

[204] Defendants' 56(f) Response at 12–13.

[205] Motion at 16–19.

[206] *Id.*

[207] *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982).

such protection."[208] Utah courts consider the following factors in determining the reasonableness of non-compete agreements: "[1] [g]eographical extent; [2] the duration of the limitation; [3] the nature of the employee's duties; and [4] the nature of the interest which the employer seeks to protect such as trade secrets, the goodwill of his business, or an extraordinary investment in the training or education of the employee."[209]

The first factor, geographic scope, is discussed above. Second, the duration of the restraint is proper only if it is "necessary in its full extent for the protection of some legitimate interest of the promise, and it must not be unduly harsh and oppressive to the covenantor."[210] Utah courts have upheld restrictive covenants for up to twenty-five years.[211] The duration of Smith's covenant is one year.[212] The duration of Williams's covenants is one year.[213] The duration of Carrell's covenant is one year.[214] A year is reasonable for a covenant not to compete. Defendants do not argue otherwise.

Third, the employee's duties must amount to something more than a common calling: "Covenants not to compete which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable."[215] One way to determine whether the employee is engaged in a common calling is if her job "required little training;" if it "is not unlike the job of many other[s]" in that occupation; and if her "services [are] special, unique, or

---

[208] *Allen v. Rose Park Pharmacy*, 120 Utah 608, 614 (1951).

[209] *Robbins*, 645 P.2d at 627.

[210] *Electrical Distributors Inc.*, 166 F.3d at 1085.

[211] *See e.g., Robbins,* 645 P.2d at 624 (upholding a non-compete clause with a one-year restriction); *Valley Mortuary v. Fairbanks,* 225 P.2d 739, 741 (Utah 1951) (upholding a non-compete clause with a twenty-five-year restriction).

[212] Smith/Equity Agreement ¶ 8.

[213] Williams/Equity Agreement ¶ 7.

[214] Carrell/Equity Agreement ¶ 7.

[215] *Robbins*, 645 P.2d at 627.

extraordinary."[216] The Utah Supreme Court has given at least one example of what may be considered a common calling. It stated that "persons engaged in common callings, *such as salespersons*"[217] may not be bound by non-competition agreements. The Court of Appeals of Texas stated that "a person engaged in a 'common calling' is one who performs a generic task for a living, one that changes little no matter for whom or where an employee works."[218] And in another Court of Appeals of Texas decision, working under a test similar to Utah's four-part test, the court defined "common calling": "'Common' is defined as 'of a usual type or standard; quite usual and average; entirely ordinary and undistinguished.' 'Calling' is defined as 'the activity in which one customarily engages as a vocation or profession.'"[219] The court then reviewed decisions finding that barbering is a common calling and that an individual skilled in auto trim repair is engaged in a common calling. It went on to find that it could not "hold that as a matter of law an office manager is a 'vocation or profession,' 'of the usual type,' which is 'entirely ordinary and undistinguished.'"[220]

With these definitions in mind, Smith, Williams, and Carrell are not engaged in a common calling. Williams's and Smith's positions were unique. The defendants emphasize the number of title company office managers in Utah, but quantity alone does not define "common." Carrell's position as office manager in a First American branch was not "entirely ordinary and

---

[216] *Id.* at 628.

[217] *Kasko Servs. Corp. v. Benson*, 831 P.2d 86, 96 (Utah 1992).

[218] *B. Cantrell Oil Co. v. Hino Gas Sales, Inc.*, 756 S.W.2d 781, 783 (Tex. Ct. App. 1988).

[219] *Travel Masters, Inc. v. Star Tours, Inc.*, 742 S.W.2d 837, 840–41 (Tex. Ct. App. 1987).

[220] *Id.* at 841.

undistinguished";[221] it was not one that "changes little no matter for whom or where" she works.[222]

Finally, the nature of the interest that the employer seeks to protect must be sufficient to justify the restraint on competition. Some of those interests may include protecting "trade secrets, the goodwill of the business, or an extraordinary investment in the training or education of the employee."[223]

For the Williams's and Carrell's non-compete agreements and Smith's and Williams's non-solicitation agreements, First American's interest is sufficient to justify restraining the Individual Defendants' competition and solicitation. They each were responsible for a significant amount of First American's goodwill with First American's customers and with other employees.[224] Defendants argue that in order to justify restrictive covenants, the employee must be responsible for *all* the employer's goodwill. They support that argument by referencing *Robbins v. Finlay*.[225] Defendants improperly emphasize the qualifier "all" in *Robbins*. The Utah Supreme Court does not hold that the employee must be responsible for *all* the employer's goodwill. Indeed, such a standard would invalidate nearly every non-compete agreement. The court was simply describing the facts of a previous case where it considered the validity of a non-compete agreement. Thus, for a non-compete to be valid, the question of goodwill is only relevant in so far as it relates to "the nature of the interest which the employer seeks to protect."[226] And when it is relevant, the employee need not be responsible for *all* the employer's

---

[221] *Id.*

[222] *B. Cantrell Oil Co.*, 756 S.W.2d at 783.

[223] *Robbins*, 645 P.2d at 627.

[224] Order on the Motion for Partial Summary Judgment ¶¶ 58–65; Undisputed Material Facts ¶¶ 103–111.

[225] Motion at 16.

[226] *Robbins*, 645 P.2d at 627.

goodwill. In the case-by-case analysis "the interest of one seeking to enforce . . . a covenant [not to compete]" is balanced "against the hardship imposed on the employee as the result of the restraint."[227] In this case, balancing the Individual Defendants' interests against First American's interests justifies the hardship imposed on the Individual Defendants.

### 2. First American may be equitably estopped from enforcing the Equity employment agreements.

Defendants claim that First American is equitably estopped from enforcing the employment agreements. Defendants emphasized the equitable estoppel defense[228] after receiving the Rule 56(f) notice.[229] For the first time in the record, Carrell declares that a manager at First American, Cherry Dornbier, "told [her] that Equity was gone, and that [her] former Equity contracts no longer existed."[230] Smith also declares that Kurt Andrewsen, First American's former HR representative, "told [him] that Equity was gone, that [his] old Equity contract no longer existed."[231] Carrell's and Smith's averments create a question of fact for the jury. "Only if the court can say, on [a] sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant."[232] "Utah courts define equitable estoppel as conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct."[233] It is possible that Carrell

---

[227] *Id.*

[228] Answer at 23, docket no. 17, filed April 28, 2015.

[229] Defendants' 56(f) Response at 11 ("Because Kurt Andrewsen denied telling Mike Smith that he had no more [sic] contract with Equity, thus created a dispute of fact, Defendants did not raise equitable estoppel defense in their motion.").

[230] Seventh Declaration of Kristi Carrell ¶ 11, docket no. 375-1, filed November 14, 2016.

[231] Ninth Declaration of Michael Smith ¶ 11, docket no. 375-3, filed November 14, 2016.

[232] *Hotel 71 Mezz Lender LLC*, 778 F.3d at 603.

[233] *Youngblood v. Auto-Owners Ins. Co.*, 111 P.3d 829 (Utah Ct. App. 2005).

relied on Andrewsen's and Dornbier's alleged representations that her Equity agreement would no longer restrict competition when she decided to work for Northwest, and, that Smith relied on those statements when he directed numerous First American employees to Doug Smith who later hired them on behalf of Northwest. It is also possible that Williams relied on Carrell's and Smith's understandings.

If at trial the defendants prove that Andrewsen's and Dornbier's conduct led the Individual Defendants, "in reliance thereon, to adopt a course of action resulting in detriment or damage," the analysis in the sections above is simply overcome by estoppel, i.e. the contracts, though valid, could not be enforced.

### 3. Unconscionability does not bar enforcement of the CIIA.

The defendants argue that the CIIA is unconscionable.[234] When deciding if a contract is unconscionable "a court must assess the circumstances of each particular case in light of the twofold purpose of the doctrine, prevention of oppression and of unfair surprise."[235] This analysis is done "in terms of 'substantive' and 'procedural' unconscionability."[236] "Gross disparity in terms [i.e. substantive unconscionability], absent evidence of procedural unconscionability [unfairness in contract formation], can support a finding of unconscionability"[237] However, procedural unconscionability in formation of a contract with fair terms may not be enough to invalidate a contract. "While it is conceivable that a contract might be unconscionable on the theory of unfair surprise without any substantive imbalance in the

---

[234] Motion at 20-25.

[235] *Resource Management Co. v. Weston Ranch and Livestock Company Inc.*, 706 P.2d 1028, 1041 (Utah 1985).

[236] *Id.*

[237] *Id.* at 1042.

obligations of the parties to the contract [procedural unconscionability], that would be rare."[238]

Whether parties argue for procedural or substantive unconscionability, "a duly executed written

contract should be overturned only by clear and convincing evidence."[239] "[T]he critical juncture

for determining whether a contract is unconscionable is the moment when it is entered into by

both parties . . . . Unconscionability cannot be demonstrated by hindsight."[240]

### a.   The CIIA may have some procedural unconscionability.

Procedural unconscionability "focuses on the manner in which the contract was

negotiated and the circumstances of the parties."[241] A contract is procedurally unconscionable if

there is an "absence of meaningful choice."[242]

> Whether a meaningful choice is present in a particular case can only be
> determined by consideration of all the circumstances surrounding the transaction.
> In many cases the meaningfulness of the choice is negated by a gross inequality of
> bargaining power. The manner in which the contract was entered is also relevant
> to this consideration. Did each party to the contract, considering his obvious
> education or lack of it, have a reasonable opportunity to understand the terms of
> the contract, or were the important terms hidden in a maze of fine print and
> minimized by deceptive sales practices?[243]

The Utah Supreme Court has enumerated the following indices of procedural

unconscionability:

1.  "the use of printed form or boilerplate contracts drawn skillfully by the party in the
    strongest economic position, generally offered on a take-it-or-leave-it basis";[244]
2.  "phrasing contractual terms in language that is incomprehensible to a layman or that
    diverts his attention from the problems raised by them or the rights given up through
    them";[245]

---

[238] *Id.*

[239] *Id.* at 1043.

[240] *Id.*

[241] *Id.* at 1041.

[242] *Id.* at 1042.

[243] *Id.*

[244] *Id.*

[245] *Id.*

3. "hiding key contractual provisions in a maze of fine print";[246]
4. hiding key contractual provisions "in an inconspicuous part of the document";[247]
5. "minimizing key contractual provisions by deceptive sales practices";[248]
6. "lack of opportunity for meaningful negotiation";[249]
7. "whether the aggrieved party was compelled to accept the terms";[250] and
8. "exploitation of the underprivileged, unsophisticated, uneducated and illiterate."[251]

Because the Individual Defendants deal in the business of contracts, the first, second,[252] and sixth are the only relevant indices.

The Individual Defendants were frequently required to look at online documents that consisted of training presentations and other documents.[253] After opening and reviewing the presentations and documents, the Individual Defendants and other First American employees were required to acknowledge that they understood and in some cases agreed to be bound by that material.[254] For the CIIA, before accessing it, the employees were prompted to "contact [their] local division human resources representative or Corporate Human Resources at" a given email address if they had any questions.[255] First American employees were given time to read the CIIA before agreeing to its terms.[256] The CIIA is four pages long.[257] Those former First American

---

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.*

[252] Only considered insofar as the defendants argue that the sheer quantity of material the Individual Defendants and other former First American employees were asked to review drew their attention away from the seriousness of the CIIA.

[253] Undisputed Material Facts ¶ 52.

[254] *Id.* ¶¶ 55–59.

[255] *Id.* ¶ 59.

[256] *Id.* ¶ 60.

[257] *Id.* ¶ 61.

employees who were deposed for this litigation did not recall seeing or agreeing to the CIIA.[258] First American's records show that they did.[259] Lack of recollection is not inconsistent with an event, so there is no dispute that the online consent was recorded.

The parties provide no background on how the CIIA was drafted. There is also no indication that each CIIA was identical, but considering its purpose, and the online process for assent, it seems unlikely that the CIIA was customized for each employee.

The CIIA defines Engagement as "my initial and/or continuing engagement as an employee, director or officer of the Company." [260] The first line states, "In consideration of my Engagement with First American Financial Corporation, a Delaware Corporation, and/or its subsidiaries, parents, holding companies, related companies, and affiliates, and other valuable consideration, including but not limited to training and the receipt of confidential information, I agree as follows."[261] The terms of the CIIA then follow. By stating "In consideration of my Engagement,"[262] which includes "continuing engagement as an employee, director or officer,"[263] First American creates a "take-it-or-leave-it" situation; i.e. either the employees agree to the terms of the CIIA or they leave First American. There is no indication on the record, however, that anyone was actually dismissed for failing to acknowledge the CIIA.

The Individual Defendants were employees of Equity for significant periods before Equity was acquired by First American. They were not the typical new employee who faces a contract before employment or before much investment in a position. They had developed

---

[258] *Id.* ¶ 62.

[259] *Id.* ¶ 63.

[260] CIIA ¶ 1.

[261] *Id.* at 1.

[262] *Id.*

[263] *Id.*

relationships with customers and knowledge of business practices and expertise in their work with Equity which now was transferred to the business sphere of First American. These facts present a potential for procedural unfairness not present in typical cases.

Weighing the Individual Defendants' sophistication and experience with contracts against the Individual Defendants' lack of opportunity to meaningfully negotiate the terms of the agreement, procedural unconscionability is present to some degree.

### b. Substantively unconscionable aspects of the CIIA will not be enforced.

Substantive unconscionability "examines the relative fairness of the obligations assumed."[264] It is often "indicated by contract terms so one-sided as to oppress or unfairly surprise an innocent party, . . . [or] an overall imbalance in the obligations and rights imposed by the bargain."[265] "[T]he test is whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place."[266]

The CIIA defines confidential information to include "any trade secret, data, know-how, knowledge, idea, information and materials relating to the past, present, planned or foreseeable business, products, services, developments, technology or activities of the Company."[267]

The CIIA then lists eleven examples of what may be considered confidential. Included among those examples it states "(7) any names, history, preferences and practices of any customers or potential customers, licensors, licensees, vendors, suppliers, distributors or partners."[268]

---

[264] *Resource Management Co.*, 706 P.2d at 1041.

[265] *Id.* (internal citations and quotation marks omitted).

[266] *Id.* at 1042 (internal quotation marks omitted).

[267] CIIA ¶ 2.

[268] *Id.*

Its subsequent provisions state:

- that the employee "will not, during or *at any time after the cessation* of my Engagement with the Company for whatever reason, access, use, reproduce, or disclose any Confidential Information"[269]
- that the employee "will not use Confidential Information, during my Engagement *or at any time thereafter,* directly or indirectly, for myself or for any third party, to recruit, solicit for hire or divert from the Company any employee of the Company"[270]
- that the employee "will not use any of the Company's trade secrets or confidential information to solicit or encourage any customer, service provider or vendor to cease doing business with the Company and/or to commence doing business with any other person or entity;"[271] and
- that during the employee's engagement with First American, the employee "will not engage in any business activities which are competitive with the Company or otherwise in conflict with my duties on behalf of the Company, unless the Company has given its consent in writing."[272]

In short, the CIIA is comprehensive. The interplay between its definition section and some of the subsequent restrictions imposes unconscionable obligations on the Individual Defendants. For instance, the seventh example ("any names, history, preferences and practices of any customers or potential customers, licensors, licensees, vendors, suppliers, distributors or partners") would prevent former employees from contacting any customer (along with any licensors, licensees, vendors, suppliers, distributors or partners) "at any time after the cessation of [the employee's] Engagement with" First American.[273] It is one thing to prevent former employees from using lists compiled and maintained by First American, and it is quite another to prevent a former employee from *ever* contacting First American's customers. That provision is

---

[269] *Id.* ¶ 3.

[270] *Id.*

[271] *Id.*

[272] *Id.* ¶ 12.

[273] *Id.* ¶ 3.

anti-competitive and contrary to Utah case law prohibiting non-competition agreements from barring contact with former customers without limitations on "time and geographic area."[274]

Additionally, the definition of Confidential Information is so broad that it includes "know-how, knowledge, idea, information and materials relating to the past, present, planned or foreseeable business, products, services, developments, technology or activities of the Company." While the CIIA does state that "[c]onfidential information does not include any information, idea or material . . . that was rightfully in my possession or part of my general knowledge prior to or independent of my Engagement." Those exclusions fail to include "know-how, knowledge, [or] idea[s]" obtained by the former employees during the employee's employment with the plaintiff-employer. Limiting an employee from using skills fundamental to her profession—whether gained before, during, or after employment—is "so one-sided as to oppress"; the hallmark of being substantively unconscionable.

"Where the offending provision is separable from the rest of the contract, the non-offending provisions are enforceable."[275] When contracts contain unconscionable provisions, courts may excise the offending provisions as long as it does not change the fundamental nature of the contract.[276]

Excision of the specific CIIA language creating these unconscionable burdens could alter it beyond its fundamental nature. The phrase "at any time thereafter" creates a permanent barrier to contact of former customers which is impermissible under Utah law.[277] But if in each iteration

---

[274] *Kasko Services Corp.*, 831 P.2d at 88 n.1 (citing *Allen*, 237 P.2d at 828).

[275] *Neilson v. Neilson*, 780 P.2d 1264, 1270 (Utah 1989).

[276] *See* Restatement (Second) of Contracts § 183 (collecting cases). Also, the CIIA states, "If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement will not fail on account thereof but will otherwise remain in full force and effect. If any obligation in this Agreement is held to be too broad to be enforced, the Company and I agree that, it will be construed to be enforceable to the full extent permitted by law." CIIA ¶ 17.

[277] *Crane v. Dahle*, 576 P.2d 870, 872–73 (Utah 1978).

of the phrase "at any time thereafter," were removed from section three, former employees could disclose confidential information at the moment they resign. The duration language has too many functions in the CIIA to be stricken.

Rather than declaring the entire CIIA unconscionable or unenforceable or blue penciling words in the CIIA to render it consistent with Utah law, the offensive provisions will not be enforced. If necessary, the jury instructions will clarify that an employee may contact former customers without breach of the CIIA and is not restrained by the CIIA in use of the employee's know-how gained before, during, or after employment by First American.

Damages remain a question of fact. The other elements of the contract analysis for the CIIA (i.e., performance by First American, breach by the Individual Defendants) remain for trial.

### 4. The Employee Handbook and the Code of Ethics and Conduct are enforceable contracts but issues of fact relating to versions remain for the jury.

Documents such as the Employee Handbook and Code of Ethics and Conduct[278] can create contractual obligations: "An employee manual may create a unilateral contract."[279] The unilateral contract analysis is two-part. First, "an employer's promise of employment under certain terms and for an indefinite period constitutes both the terms of the employment contract and the employer's consideration for the employment contract."[280] In this case, the "certain terms" of the First American's employment promise are those conditions enumerated in the Employee Handbook and the Code of Ethics and Conduct. Second, "the employee's performance of service pursuant to the employer's offer constitutes both the employee's acceptance of the

---

[278] Though not attached to the Complaint, the Code of Ethics and Conduct "is intended to supplement the Company's corporate and divisional policies/guidelines and the *Employee Handbook, The First American Way*." Employee Handbook at 4-2. As such, it will be considered part of the Handbook, which is attached to the Complaint. The analysis for the Handbook applies to the Code of Ethics and Conduct.

[279] *Reynolds v. Gentry Finance Corp. and Royal Management*, 368 P.3d 96, 100 (Utah 2016).

[280] *Id.*

offer and the employee's consideration for the contract."[281] In short, "[t]he employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer."[282]

Defendants argue that such unilateral contracts impose only one-way obligations: The employees can seek to enforce them against the employer, but the employer cannot enforce them against the employee.[283] The defendants do not cite authority for that proposition. They simply note that the cases they came across all consisted of an employee attempting to treat a handbook as a contract.[284]

In *Trembly v. Mrs. Fields Cookies*,[285] Trembly, a former employee of Mrs. Fields Cookies, sued Mrs. Fields for, among other things, breaching an implied-in-fact contract. Trembly claimed that statements by supervisors had altered his at-will status by creating an implied-in-fact contract. The court found that even if there were an implied-in-fact contract based on the supervisor's representations, the handbook, which was distributed after the supervisor's representations, would have altered the terms of the implied-in-fact contract because it stated that all Mrs. Fields's employees are at-will. The court reasoned, "if an employee has knowledge of a distributed handbook that changes a condition of the employee's employment, and the employee remains in the company's employ, the modified conditions become part of the employee's employment contract."[286] Necessarily, then, if the handbook becomes part of the

---

[281] *Id.*

[282] *Id.*

[283] Reply at 13–14.

[284] *Id.*

[285] 884 P.2d 1306 (Utah Ct. App. 1994).

[286] *Id.* at 1312.

employee's employment contract, the employer is also able to enforce contractual obligations

borne from employee manuals and handbooks.

Defendants also argue that the Handbook and Code should not be enforced because First

American's promises are illusory.[287] "An illusory contract may be defined as an expression

cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has

not committed himself in any manner. In other words, an illusory promise is a promise that is not

a promise. The promise is an illusion."[288]

Defendants base this argument on a partial quote from the Handbook's acknowledgement

page that states: "The Company reserves the right to revise, rescind and supplement the policies

or guidelines therein whenever the Company deems such changes appropriate, with or without

prior notice."[289] The Handbook does not leave it there, however. At greater length, the Handbook

states:

> I [the employee] will familiarize myself with the material in **The First American
> Way** [the Handbook], and I understand and agree that I am responsible for
> knowing its contents and periodically reviewing the handbook for changes. The
> Company reserves the right to revise, rescind, and supplement the policies or
> guidelines therein whenever the Company deems such changes appropriate, with
> or without prior notice. If the Company makes such a change, the revised policy
> will prevail and no oral or collateral agreement to the contrary shall be valid.
>
> I understand that the Company will provide electronic updates to the material in
> **The First American Way,** and I am responsible for reading and electronically
> acknowledging the updates. Any updates, whether I acknowledge them or not,
> have the same force and effect as if they were contained in the handbook itself.[290]

This longer quote shows that employees are required to "periodically" review the

handbook. It also shows that First American will provide electronic updates and the employee is

---

[287] Defendants' 56(f) Response at 14.

[288] *Harrington v. Harrington*, 365 N.W.2d 552, 555 (N.D. 1985).

[289] Employee Handbook at i.

[290] *Id.* (bold in original).

required to read and acknowledge each update. So even though First American disclaims any obligation to provide "*prior* notice" and "reserves the right to revise, rescind, and supplement the policies," the Handbook requires First American to provide notice of the updates to the employee and give an opportunity to acknowledge those updates.

The last sentence in the quoted text, however, could be interpreted to render this agreement illusory: "Any updates, whether I acknowledge them or not, have the same force and effect as if they were contained in the handbook itself."[291] But because First American agrees to communicate updates (though not necessarily provide prior notice) and an employee agrees to be "responsible for knowing [the Handbook's] contents and periodically reviewing the handbook for changes," the cases requiring actual not constructive knowledge are satisfied.[292] An employee's failure to acknowledge an update does not eliminate the need for notice or mitigate the employee's duty to be aware. If the employer can prove notice was received, and the employee continues employment, the update is effective. First American has the privilege of updating and adjusting the handbook as circumstances change, but employees are only responsible for those updates for which they received notice.

Construing the handbook in this way creates certain factual issues. First, it does not appear that the Individual Defendants received or acknowledged the version of the Handbook First American attaches to the Complaint.[293] That version was apparently released in June 2014, though the opening page "Receipt of The First American Way" says that it was "Revised 1/15/15."[294] Elaine Basler, an analyst at First American, attaches to her declaration an exhibit

---

[291] *Id.*

[292] *See, e.g.*, *Ryan*, 972 P.2d at 402 ("We hold that Ryan's receipt *and acknowledgment* of the handbook . . . revoked any express or implied contractual conditions contradictory to the handbook"); *Trembly*, 884 P.2d at 1312.

[293] Exhibit C Employee Handbook, docket no. 2-4, filed April 3, 2015.

[294] *Id.* at i.

spreadsheet that tracks employee training and whether employees have acknowledged certain

documents.[295] As Basler summarizes, the Individual Defendants "most recently acknowledged

the following versions of the Handbook on the following dates":

> Kristi Carrell, v.0112, 8/30/2012
> Michael Smith, v.0411, 7/11/2011
> Jeff Williams, v.0411, 7/22/2011

The 0411 version is not attached to any filing on the docket. Additionally, in the

spreadsheet there are concerning designations. The column labeled "Completion Status" has

several status possibilities. The two most relevant include "eLEARNING COMPLETE" and

"ACKNOWLEDGEMENT READ AND ACKNOWLEDGED." For Carrell's most recent entry

for the Handbook, under the Completion Status column it says "ACKNOWLEDGEMENT

READ AND ACKNOWLEDGED."[296] But for Williams and Smith it says "eLEARNING

COMPLETE."[297] These different designations appear to be governed by whether they are

characterized as eLEARNING or ACKNOWLEDGEMENT under the "Item Type" column.

> In another declaration Basler states
>
> In addition to capturing the initial instance an employee acknowledges an
> agreement or completes a training, KnowledgeSPOT captures every instance in
> which an employee updates his acknowledgement to an agreement or completes
> an updated or revised training. So long as an employee completes what he has
> begun on KnowledgeSPOT, KnowledgeSPOT records every instance an
> employee logs in to the system.[298]

This also creates questions of fact. Were there other, later versions of the Handbook to

which the Individual Defendants received but may not have completed the training? Did the

Individual Defendants have access to the later versions? Also, the last sentence seems to

---

[295] Exhibit G to Declaration of Elaine Basler, docket no. 164-29, filed April 21, 2016.

[296] *Id.*

[297] *Id.*

[298] Declaration of Elaine Basler ¶ 6, docket no. 192-6, filed May 17, 2016.

contradict itself. Is a new entry created in KnowledgeSPOT upon completion of a task or upon logging in to the system?

The difference between versions, the difference between completion status designations, and the process for creating entries in KnowledgeSPOT may ultimately prove to be meaningless. The critical terms in variant Handbook versions may be identical. But on summary judgment, the possibility of meaningful facts and differences cannot be ignored. The court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[299] For a ruling that the Handbook and Code of Ethics and Conduct is an enforceable contract, the nonmovant is effectively the defendants.[300]

These questions of which terms are enforceable against each Defendant will remain for trial. The jury will not consider the legal question of whether the Handbook or Code of Ethics and Conduct could be binding contracts. That issue is decided in the affirmative above. The jury will consider whether the Individual Defendants received any relevant changes in policy and determine which terms govern each defendant.[301]

The other elements of the breach of contract claim for the Handbook and the Code of Ethics (performance by First American, performance by the Individual Defendants, and damages) also remain for trial.

---

[299] *Id.*

[300] *Hotel 71 Mezz Lender LLC*, 778 F.3d at 603.

[301] The Handbook states that "If the Company makes such a change, the revised policy will prevail and no oral or collateral agreement to the contrary shall be valid." Handbook at i. Thus, for each Individual Defendant, the base agreement is the last one they received, as demonstrated in Basler's KnowledgeSPOT spreadsheet. If there were relevant, subsequent changes that First American is now seeking to enforce, the jury will decide whether the Individual Defendants had access to and acknowledged those changes.

**COUNT VI: SMITH MAY BE LIABLE FOR BREACHING HIS FIDUCIARY DUTY TO
FIRST AMERICAN; QUESTIONS OF MATERIAL FACT EXIST AS TO CAUSATION
AND DAMAGES.**

In Count VI,[302] First American alleges that Mike Smith breached his fiduciary duty to
First American by "hiring and enticing First American's employees away from their employment
at First American to work at Northwest Title; causing First American employees to breach their
contractual agreements with First American; and luring away First American's customers to
Northwest Title, thereby interfering with First American's relationships with its customers."[303]

"A claim for breach of fiduciary duty requires proof of four elements: (1) a fiduciary
relationship; (2) breach of the fiduciary's duty; (3) causation, both actual and proximate; and (4)
damages."[304]

**1.   Smith had a fiduciary relationship with First American.**

Attorneys have a fiduciary relationship with their clients.[305] There is no dispute that
Smith acted as an attorney for First American.[306]

**2.   Smith breached that duty.**

"Pursuant to the Model Rules of Professional Conduct . . . , counsel owes fiduciary duties
of loyalty and care to his/her client . . . . Counsel's duty of loyalty to the [client] includes the
duty to maintain client confidentiality and prevent any conflict of interest."[307] An attorney must
"represent the client with undivided loyalty, to preserve the client's confidences, and to disclose

---

[302] Complaint ¶¶ 169–75.

[303] *Id.* ¶ 171.

[304] *Old Republic Nat. Title Ins. Co. v. Home Abstract and Title Co. Inc.*, No. 1:12CV00171, 2014 WL
2918551, at *15 (D. Utah June 27, 2014).

[305] *Orlando Millenia LC v. United Title Services of Utah Inc.*, 355 P.3d 965, 971 (Utah 2015).

[306] Undisputed Material Facts ¶ 10.

[307] *Hanson, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 454 (Bankr. D. Utah 1998).

any material matters bearing upon the representation [of the client]."[308] "Fiduciary duties include

acting with utmost fairness to clients, making full disclosure, avoiding representation which

conflicts with that of the client, and preserving confidences of the client."[309] But, according to

the Restatement (Second) of Agency, employees, "even before the termination of the agency,

[are] entitled to make arrangements to compete, except that [they] cannot properly use

confidential information peculiar to [their] employer's business and acquired therein."[310]

Acknowledging an employee's right to compete, First American argues that attorneys are

subject to a heightened degree of loyalty.[311] The defendants, by contrast, divide an attorney's

loyalty into two categories: legal and economic.[312] In their words:

> FATCO refuses to distinguish between legal conflicts, which can be problematic,
> and purely economic conflicts, which are usually not even reportable to clients.
> The language quoted by FATCO from the comment to Utah Rule of Professional
> Conduct 1.7 refers to employment with a legal opponent, not an economic
> competitor.[313]

Defendants cite no authority to support this distinction. It seems unlikely that, absent a

valid waiver, any court would support the proposition that an attorney can properly represent a

client when the attorney and the client have conflicting economic interests. Defendants ignore

the common sense rule that this cannot ethically occur. The rule is stated in Restatement (Third)

of the Law Governing Lawyers § 206:

> Unless the affected client consents to the representation under the conditions and
> limitations provided in § 202, a lawyer may not undertake or continue to represent
> a client if a substantial risk exists that a financial or other personal interest of the

---

[308] *Iacono v. Hicken*, 265 P.3d 116, 122 (Utah Ct. App. 2011).

[309] *Id.*

[310] Restatement (Second) of Agency § 363

[311] Opposition at 151–52.

[312] Reply at 23.

[313] Reply at 23.

lawyer will materially and adversely affect the lawyer's representation of the client.[314]

Defendants misconstrue comment 6 of Rule 1.7 of the Utah Rules of Professional Conduct. The rule states in part: "simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients."[315] This comment relates to representation only. Smith was not acting as an attorney for Northwest, he had part ownership in Northwest. This ownership interest contrary to First American's interests created conflicted loyalty.

The defendants argue that Smith was only "harboring economically disloyal thoughts while performing legal tasks."[316] Conflicts of *interest* are prohibited because they divide loyalties, intentions, focus, and efforts. As many of the undisputed material facts show,[317] Smith did more than just *think* about putting himself in economic opposition to First American. For instance, Smith helped Westcor, one of First American's major competitors, establish an underwriting relationship with Northwest.[318] Therefore, the facts presented in their briefing demonstrate Smith breached his fiduciary duty of loyalty to First American.

---

[314] Restatement (Third) of the Law Governing Lawyers § 206 TD No 4 (1991).

[315] Rule 1.7. Conflict of Interest: Current Clients.
http://www.utcourts.gov/resources/rules/ucja/view.html?rule=ch13/1_7.htm.

[316] Reply at 23.

[317] Undisputed Material Facts ¶¶ 73–102.

[318] *Id.* ¶ 85.

### 3. All elements remain for the jury.

Notwithstanding the analysis above, all facts on this claim remain for the jury to decide. Parties were not provided Rule 56(f) notice on this cause of action.[319] Without that notice, summary judgment cannot be granted against the movant defendants.

## CONCLUSION

This order resolves elements of certain causes of action. It does not resolve any cause of action in its entirety. Many issues are left for the jury to resolve.

## ORDER

THEREFORE, the defendants' Motion for Summary Judgment and Memorandum in Support[320] is MOOT IN PART and DENIED IN PART. Pursuant to the Order on Stipulated Motion to Dismiss Certain Claims Against Defendants,[321] the portions of the Motion related to the following causes of action are now MOOT: Counts VII–VIII for misappropriation of trade secrets; Count IX for unfair competition; Count XII for conversion; and Count XIII for violation of the Computer Fraud and Abuse Act. The Motion is DENIED for the remaining causes of action.

Under Federal Rules of Civil Procedure Rule 56(f), summary judgment is GRANTED for First American on the following issues:

- First American did not materially breach the Individual Defendants' Equity employment agreements;
- No impermissible expansion of geographic scope bars First American's enforcement of the employment agreements;
- Duration, nature of interest, and Individual Defendants' positions do not render the non-competition provisions of the employment agreements unenforceable;
- Unconscionability does not bar enforcement of the CIIA;

---

[319] *See* Docket Text Order, docket no. 335, entered November 4, 2016.

[320] Docket no. 163, filed April 19, 2016.

[321] Docket no. 384, entered November 18, 2016.

- The Employee Handbook and the Code of Ethics and Conduct are unilateral, enforceable contracts that are not illusory; and
- 56(f) ruling is reserved for tortious interference of contracts (Causes of Action IV, V), tortious interference with economic relations (Cause of Action X), and conspiracy (Cause of Action XI).

The Motion to Reconsider or to Reconsider and Certify to the Utah Supreme Court Order Granting in Part and Denying in Part First American's Motion for Partial Summary Judgment[322] is DENIED.

Dated November 23, 2016.

BY THE COURT:

_____
David Nuffer
United States District Judge

---