IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY and FIRST AMERICAN TITLE COMPANY, LLC,<br><br>      Plaintiff,<br>v.<br><br>NORTHWEST TITLE INSURANCE AGENCY, LLC; MICHAEL SMITH; JEFF WILLIAMS; and KRISTI CARRELL,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [265] MOTION IN LIMINE TO EXCLUDE REPORT [SIC] AND TESTIMONY OF RICHARD S. HOFFMAN**<br><br>Case No. 2:15-cv-00229-DN<br><br>District Judge David Nuffer |

## MOTION OVERVIEW

Defendants "seek the exclusion of the testimony of Richard S. Hoffman, the damages expert designated by Plaintiffs . . . ."[1] "First American engaged Mr. Hoffman and his company, Lone Peak Valuation Group, to calculate certain damages it [allegedly] suffered as a result of the [alleged] unlawful conduct committed by Defendants."[2] Mr. Hoffman offers opinions in three principal areas:

  a. Lost Profits;
  b. Disgorgement of Profits; and
  c. Extra Expenses.[3]

---

[1] Motion in Limine to Exclude Report and Testimony of Richard S. Hoffman, docket no. 265, filed under seal August 26, 2016.

[2] Opposition to Defendants' Motion in Limine to Exclude Report and Testimony of Richard S. Hoffman, docket no. 274, filed September 9, 2016.

[3] Expert Witness Report [of Richard S. Hoffman] ("Hoffman Report") dated March 14, 2016, docket no. 265-1, filed under seal August 26, 2016. This report was partially updated by the June 28, 2016 Rebuttal Expert Witness Report ("Rebuttal Report"), docket no. 265-7, filed under seal August 26, 2016. The Rebuttal Report attached a complete set of schedules (though only Schedules 1, 1.2, 11, 11.1, 11.2, 11.4, 11.5, 14 and 15 were updated or new). First American's List of Schedules to Expert Reports of Richard S. Hoffman, docket no. 360, filed November 10, 2016.

Defendants challenge all these opinions and Mr. Hoffman's qualifications, assumptions and methodology.

## DISCUSSION

### 1. Governing Standards

Federal Rule of Evidence 702 governs the motion.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"Defendants do not dispute that Mr. Hoffman is generally qualified to do damages calculations."[4] But they challenge his qualifications in this case and assumptions, methods and application of methods. Defendants specific challenges will be discussed in separate sections that follow.

### 2. Mr. Hoffman's Qualifications and Assumptions

Defendants "challenge Mr. Hoffman's qualifications to make critical assumptions specific to the title and escrow industry"[5] and to his use of data supplied by First American in developing his opinions.[6] The rules expressly permit experts to rely on data provided by others: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."[7]

---

[4] Motion at 2.

[5] Motion at 2.

[6] Motion at 10; Reply Memorandum in Support of Motion in Limine to Exclude Report and Testimony of Richard S. Hoffman ("Reply") at 5, docket no. 296, filed October 11, 2016.

[7] Fed. R. Evid. 703.

Mr. Hoffman's qualifications *in his field* are evident and he has identified in his report and deposition the assumptions he has made *outside his field* as to the title and escrow industry. Defendants may contest these assumptions in cross examination or by independent testimony.

### 3. Mr. Hoffman's Methods and Opinions

#### a. Failure to Attribute Damage by Claim or Defendant

Defendants assume, as they did in their Motion in Limine to Preclude Certain Damages Evidence,[8] that First American's expert report and expert testimony will be the exclusive sources of proof of causation and fault. Defendants may be correct that "[t]he 'competition' of each of the Individual Defendants –the only FATCO employees allegedly contractually obligated not to compete – was different in nature, and had discrete, differing effects."[9] And the same could be said of "solicitation" and other alleged wrongs. One would assume that in the course of presentation of evidence, proof will be given sufficient to enable the jury to assess causation, as to defendant and claim, and thus the gap between Hoffman's report and the requirements for submission to the jury will be met. The jury should, by the time Mr. Hoffman testifies, be very acquainted with the history of the planning and implementation of defendants' business and the role of each defendant.

#### b. Failure to Consider Mitigation

Defendants also object that Mr. Hoffman did not provide an analysis of mitigation by First American.[10] They claim "FATCO took temporary steps to handle business which did not follow the departing employees, hired new revenue producing employees to replace the business which did follow the departing employees, streamlined its operations, and improved both its

---

[8] Docket no. 314, filed October 31, 2016.

[9] Reply at 2. *See also* Motion at 5.

[10] Motion at 4.

profit and its margin."[11] "However, the burden of proving plaintiff has not mitigated its damages and that its award should be correspondingly reduced is on defendant."[12] This is a proper subject for a report from defendants.[13]

### c. Lost Profits

Most of defendants' challenges regarding lost profits methodology are of a type that make good cross-examination. However, defendants raise some significant issues that may go to admissibility.

**Extrapolation of Damages into the Future.** The most fundamental is Mr. Hoffman's computation of future damages past the one-year period of contractual limitation. "[T]here is no basis whatsoever for projecting damages ten years into the future. . . . [T]his case arises from . . . employment contracts with one-year noncompetition periods."[14] No explanation is made for extrapolation of ten years of damages from one year of contractually barred activity. Defendants also raise this issue in a motion in limine.[15] Neither party has cited any case law, or economics literature, explaining how a start-up period advantage should or should not be extrapolated into the future.[16] While Mr. Hoffman has solid figures for the effect of competition in 2015,[17] the

---

[11] *Id.*

[12] *John Call Eng'g, Inc. v. Manti City Corp.,* 795 P.2d 678, 680 (Utah Ct. App. 1990).

[13] Defendants rely on dictum from *John Call* that "plaintiff must do the analysis when the relevant financial information is 'uniquely within the exclusive knowledge of the [plaintiff].'" Reply at 9. However, *John Call's dictum* relied on dictum from *Green v Nelson*, 232 P.2d 776 (Utah 1951) decided barely after the advent of discovery rules and relying on cases decided well before discovery was available. Defendants have had access to discovery.

[14] Motion at 10.

[15] Defendants' Motion in Limine Limiting Evidence, Argument or Jury Instruction Regarding Damages, docket no. 319, filed October 31, 2016.

[16] Plaintiffs' Opposition to Defendants' Motion in Limine Limiting Evidence, Argument or Jury Instruction Regarding Damages at 2, docket no. 347, filed November 7, 2016.

[17] Schedule 1.

extension of his lost profits analysis[18] for up to ten years fails to consider that defendants could have started Northwest Title in March 2016 after the expiration of their non-competition and non-solicitation constraints.

The first year of Northwest's operations is (a) in violation of some contractual terms; (b) causes First American the precise damage the contracts were designed to prevent as customer and co-worker relations were uninterrupted rather than suspended for a year; and (c) gives Northwest an advantage of immediately profitable operations, which the contracts were specifically designed to prevent. Mr. Hoffman recognizes the start-up advantage defendants enjoyed.

> Northwest was able to start operations with an infrastructure that could immediately support escrow and title services as well as generate immediate sales. Northwest's financial statements indicate they were able to generate revenue of $253,782 in March of 2015, the same month in which the employees left First American.
> The Alleged Wrongful Conduct . . . allowed Northwest to start operating instantly, without the typical ramp-up period a new business would need to get started. Thus, First American immediately experienced damages beginning in March of 2015.[19]

But that unique start-up advantage does not continue for ten years. And he makes no comparison to what could have been a much less entangled startup in March 2016.

Plaintiffs assert that the contractual limitation should not affect the tort claims,[20] but this argument ignores that the acts which were wrongful within the one-year period might not have been wrongful if engaged in after that time. This issue will be deferred pending development of evidence and authority during trial.

---

[18] Schedule 1.2.

[19] Hoffman Report lines 294-300, at 14.

[20] *Id.*

5

**Customer Retention.** The second major concern with the lost profits analysis is the assumption of retention rate for customers. Hoffman assumes it is very high,: "I considered that but for the Alleged Wrongful Conduct by the Defendants, these First American customers likely would have continued their relationships with First American . . . ."[21] Defendants claim First American's client retention rate is 45%.[22] The effect of these varying assumptions is very significant, especially as Mr. Hoffman makes projections of growth into the future, based on these retained customers.

> I prepared a chart with various scenarios to measure the Lost Profit First American experienced by losing customers that otherwise would have stayed with First American for a number of years (see Schedule 1.2). For example, if these customers would have stayed with First American for 5 additional years, lost profit would be $10,143,024.61.[23]

A problem related to the *rate* of retention is *length* of retention. "Mr. Hoffman simply assumes that, but for the Alleged Wrongful Conduct, all of the "lost" customers would have stayed with FATCO – not just in the short term – but for at least ten years.[24]

The retention rate and duration makes a large difference in lost profit calculations, since Mr. Hoffman extends his opinion out ten years. The jury should not be given opinions without a basis in evidence. Perhaps testimony will provide a foundation for his assumptions regarding retention rate and duration. A decision will be made before Mr. Hoffman testifies as to sufficiency of evidence for a basis of the retention projections into the future.

---

[21] Hoffman Report lines 365-366, at 16.

[22] Motion at xvi, citing New & Repeat Customer Report, Exhibit 8 to Motion at 3, docket no. 265-9, filed under seal August 26, 2016.

[23] Hoffman Report lines 369-372, at 16-17.

[24] Motion at xv.

### d. Disgorgement

Disgorgement of defendants' profits was a measure of damages applicable to a trade secret claim that has been dismissed. Now disgorgement is a comparative figure for the First American lost profits claim. Similar to the lost profits analysis, Hoffman's disgorgement analysis also includes long term projections which assume a long-term, high retention of customers by Northwest. The disgorgement analysis does not recognize the short term of the contractual limitations. The decision to be made as to sufficiency of evidence for a basis of projections into the future will apply to this category of testimony.

### e. Extra Expenses

Defendants challenge both categories of Extra Expenses shown in Mr. Hoffman's schedules 1.3 and 1.4.  The first purports to identify the reallocation of efforts of salaried employees "diverted from the work that they are supposed to be performing in order to accomplish tasks that should have been performed by another person."[25] While First American may feel that it "paid its employees to perform tasks that should not have been necessary to perform,"  it is not true that "the amounts paid to the employees for the time that they were diverted from their desired projects is an extra cost that has been incurred by First American."[26] Mr. Hoffman admitted that there is no out of pocket cost represented on Schedule 1.3.[27] This testimony is not the "product of reliable principles and methods . . . reliably applied to the facts of the case."[28]

---

[25] Hoffman Report lines 467-468, at 21.

[26] Hoffman Report lines 475-477, at 21.

[27] Transcript of Hearing November 22, 2016 (draft) page 19, lines 14-15.

[28] Fed. R. Evid. 702 (c)-(d).

The other schedule (1.4)[29] regarding "additional bonuses and paid overtime wages to employees for their additional hours and work covering for the employees who went to Northwest"[30] is not subject to this infirmity. "Defendants . . . reason to believe that FATCO paid these bonuses as inducements to stay at FATCO and/or as consideration for noncompetition agreements. . . ."[31] is an area for cross examination.

## ORDER

IT IS HEREBY ORDERED that defendants' motion[32] is GRANTED IN PART as to the claim for extra expenses of salaried employees and DENIED in all other respects subject to renewal as evidence is offered at trial regarding future lost profits and disgorgement.

Dated November 26, 2016.

BY THE COURT:

_David Nuffer_
David Nuffer
United States District Judge

---

[29] Rebuttal Report Schedule 1.4, docket no 265-7, at 15,

[30] Hoffman Report lines 486-487, at 22.

[31] Motion at 9-10.

[32] Motion in Limine to Exclude Report and Testimony of Richard S. Hoffman, docket no. 265, filed under seal August 26, 2016.